Harold G. Steiner and Ollie Mae Steiner v. Commissioner. Harold G. Steiner v. Commissioner.
Steiner v. Commissioner
Docket Nos. 79469, 79470.
United States Tax Court
T.C. Memo 1963-128; 1963 Tax Ct. Memo LEXIS 216; 22 T.C.M. (CCH) 603; T.C.M. (RIA) 63128; May 10, 1963
R. J. Downing for the petitioners. R. A. Guest and D. H. Eure for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent has determined deficiencies in the income tax of the petitioners and additions to tax as follows for the indicated years: Additions to tax - I.R.C. 1939
Docket
Sec.
Sec.
Sec.
Petitioner
No.
Year
Deficiency
293(b)
294(d)(2)
294(d)(1)(A)
Harold G.
79470
1945
$34,650.79
$17,325.40
$2,004.88
Steiner
Harold G.
Steiner
and Ollie
Mae
79469
1946
83,125.68
41,562.84
4,987.54
Steiner
1947
75,821.80
37,910.90
4,680.23
$7,020.36
In amended answers filed by the respondent prior to the trial herein, he alleged *217 that the correct deficiencies in tax and additions to tax for 1945 and 1946 are in the decreased amounts as set out below, moved with respect to 1947 for an increase in the deficiency in tax, in the additions to tax under sections 293(b) and 294(d)(1)(A), and made no claim for the addition to tax under section 294(d)(2) as determined by him, and alleged that for that year the correct deficiencies in tax and additions to tax are as set out below: Additions to tax - I.R.C. 1939
Docket
Sec.
Sec.
Sec.
Petitioner
No.
Year
Deficiency
293(b)
294(d)(2)
294(d)(1)(A)
Harold G.
79470
1945
$26,337.59
$13,168.80
$1,506.09
Steiner
Harold G.
Steiner
and Ollie
Mae
79469
1946
82,827.24
41,413.62
4,969.63
Steiner
1947
84,436.90
42,218.45
$7,599.32
Issues presented by the pleadings are the correctness of the respondent's action (1) in determining the taxable net income of the petitioners for 1945, 1946, and 1947 by use of the increases in net worth of petitioners plus personal and nondeductible expenditures with an adjustment for the nontaxable portion of long-term capital gains; (2) in determining the net worth of *218 the petitioners as of the close of December 31, 1944, 1945, 1946, and 1947, the amount of their personal and nondeductible expenditures for 1945, 1946, and 1947, respectively, and the amount of the nontaxable portion of their long-term capital gains for 1945 and 1946, respectively; (3) in determining that all or a part of the deficiencies in income tax for each of the years 1945, 1946, and 1947 was due to fraud with intent to evade tax; (4) in failing to determire that the period of limitation for assessment of income tax for each of the years 1945, 1946, and 1947 has expired; (5) in determining that for 1947 the petitioners were liable for the addition to tax provided in section 294(d)(1)(A); and (6) in determining that for 1945 and 1946 the petitioners were liable for the addition to tax provided in section 294(d)(2) of the Internal Revenue Code of 1939. General Findings of Fact Some of the facts have been stipulated and are so found. The petitioners, Harold G. Steiner, sometimes hereinafter referred to as the petitioner, and Ollie Mae Steiner, are husband and wife. They were married in 1930 and prior to, during, and since the taxable years in controversy, 1945, 1946, and 1947, *219 resided in Mauston, Wisconsin, where the petitioner has resided the greater portion of his life. On April 15, 1946, the petitioner filed his Federal income tax return for 1945 with the then collector for the district of Wisconsin. On January 15, 1947, and January 19, 1948, the petitioners filed their joint Federal income tax returns for 1946 and 1947, respectively, with the then collector for the district of Wisconsin. The petitioners have one child, a daughter, Sandra Sue, who was born in 1941 and who lived with them throughout the taxable years in issue. The petitioner, assisted by Paul C. Surolski, who, though not a certified public accountant, engaged in auditing, prepared the petitioner's 1945 income tax return. The returns of the petitioners for 1946 and 1947 were prepared by petitioner. In his Federal income tax return for 1945 the petitioner reported taxable net income of $5,513.48 and a tax liability thereon of $993.90. In their joint Federal income tax return for 1946 the petitioners reported taxable net income of $44,020.81 and a tax liability thereon of $20,405.39. In their joint Federal income tax return for 1947 the petitioners reported taxable net income of $10,490.90 *220 and a tax liability thereon of $2,182.05. The petitioner graduated from high school. He "grew up in" a creamery plant in Mauston, Wisconsin, with the operation of which he became familiar. The petitioner became a licensed buttermaker in Wisconsin when he was 16 years of age and for an undisclosed period thereafter made butter in the foregoing creamery plant. In 1922 when petitioner became 21 years of age, his grandmother, with whom he lived when he was in the first grade in school, gave him $2,000. Thereafter and to July 18, 1947, the petitioner received no other gifts or inheritances. In 1931 the petitioner as owner and operator began the conduct of a business known as Steiner Truck Lines which he continued to operate as a sole proprietorship until 1943 or 1944 when he disposed of a one-half interest therein. On July 1, 1945, he sold his remaining interest therein for $3,000. During 1936 the petitioner and Frank J. Moran, a brother-in-law of the petitioner, formed a partnership known as Steiner & Moran Partnership, which, according to the income tax returns filed by the petitioner with the State of Wisconsin for 1938 and 1941, engaged i the grocery and meat market business, *221 at least in those years. The petitioner continued to be a member of the partnership through 1944. At the beginning of 1945 Robert Burton owned the M B Creamery in Mauston, Wisconsin. On February 16, 1945, the petitioner acquired the creamery business and assets including land, buildings, and equipment from Burton. Thereupon the petitioner changed the name of the creamery to Juneau County Creamery, sometimes hereinafter referred to as Juneau, and thereafter through 1947 continued to own and operate it as a sole proprietorship. In the conduct of the business the petitioner purchased whole milk from farmers and manufactured therefrom and sold practically all of the allied products made from whole milk, including butter, sweet cream, and sweetened condensed milk. The petitioner caused a corporation known as The Liqua-Dry Milk Company to be formed under the laws of Wisconsin on January 7, 1947. On or about that date the petitioner acquired 92 percent of the corporation's common stock which he thereafter continued to own through 1947. Petitioner also was president of the corporation. The primary business of the corporation during 1947 was that of sales agent for products produced by *222 Juneau. At the beginning of 1948 the petitioner transferred to Liqua-Dry Milk Company all the assets used in the business operations of Juneau and thereafter Liqua-Dry Milk carried on the creamery business previously conducted by petitioner as a sole proprietorship. Issue 1. Respondent's Action in Determining the Taxable Net Income of the Petitioners for 1945, 1946, and 1947 by the Use of Increases in the Net Worth of Petitioners for Those Years Plus Additions and Adjustments. Issue 2. Respondent's Determination of Net Worth of Petitioners as of the Close of December 31, 1944, 1945, 1946, and 1947, the Amount of Their Personal and Nondeductible Expenditures for 1945, 1946, and 1947, and the Amount of Their Long-Term Capital Gains for 1945 and 1946. Findings of Fact In operating Juneau the petitioner continued in use the method of accounting theretofore used in the operation of the creamery, namely, a single entry system of bookkeeping and employed as bookkeeper the same bookkeeper, Margaret Steiner, a sister-in-law of the petitioner, who had been the bookkeeper for the creamery since about January 1935. Included in the records maintained by petitioner for the creamery operations *223 during the taxable years in issue were a farm payroll system, cash journal, sales book, sales invoices, canceled checks and bank statements, inventory records, accounts payable and accounts receivable records, notes receivable records, and records prepared at the end of each year summarizing entries made in the cash book during the year. During 1945, 1946, and 1947, the petitioner maintained in a safe located in the office of Juneau a cash fund, sometimes designated in the record and sometimes hereinafter referred to as the "revolving fund." Such fund consisted of cash received from sales of products produced by Juneau including sales made in excess of O.P.A. prices. The foregoing sales were not recorded in the books and records maintained for the creamery nor did the petitioner otherwise maintain any record or records showing the sources or the amounts of the proceeds of the sales. During the last half of 1945 the petitioner contacted Iver Skaar, a customers' man employed by a stock brokerage firm which had an office in Milwaukee, Wisconsin, and with whom petitioner previously had dealt in effecting security transactions through the firm, and requested Skaar to make a cash purchase *224 for him of some bonds without having the purchase billed through the normal billing process of a brokerage firm. In reply to an inquiry by Skaar as to the amount of money he desired to invest in bonds, the petitioner stated that he would invest $25,000 or probably $50,000. In explanation of his desire for the purchase to be made in the foregoing manner the petitioner stated that he had received some sizable cash payments from his customers for products sold at prices in excess of O.P.A. ceiling prices then in effect which had not been entered on his books and for that reason he wanted to make an investment which would not show on the books of a brokerage firm. Skaar advised petitioner that he could not make a purchase for him of bonds in the manner desired by petitioner and that he (Skaar) did not know where petitioner could have it done. In his Federal income tax return for 1945 the petitioner reported gross sales in the amount of $544,599.60 made during that year in the conduct of Juneau's operations. Gross sales made in such operations during 1946 and 1947 were reported in the amounts of $1,410,408.58 and $1,410,715.61, respectively, in petitioners' income tax returns for such *225 years. The record does not show how the above amount of gross sales reported by petitioner for 1945 was ascertained or determined. However, the above amounts of gross sales reported by petitioners for 1946 and 1947 were determined on the basis of gross deposits made during those years to the checking account of Juneau with the Bank of Mauston and were ascertained by eliminating from the total of the bank deposits various items of deposits and by making adjustments for the difference in the amounts of accounts receivable existing at the beginning and end of each year. The computation employed by petitioners in computing the reported gross sales of Juneau for 1946 was as follows: Total Bank Deposits
$1,430,282.85
Plus: Accounts Receivable 1-1-47
$22,973.33
Accounts Receivable 1-1-46
9,793.92
13,179.41
$1,443,462.26
Less: Jan. 3, 1946 deposit representing re-
ceipts of 1945 business
$ 6,132.46
Refunds: American Dairy Products Co. (check
stopped)
3,796.77
Prescott Creamery
64.53
Bubb City Jobbing Co.
995.11
Nathan Erlich
750.58
Sol Abramson
5,544.00
George Malton
76.12
George Malton
299.25
Chris Association
198.86
Whitehouse
196.00
Loan - George A. Steiner
10,000.00
Advances returned: West Union Farmers Creamery Co.
2,000.00
Fayette Creamery
3,000.00
33,053.68
Total Sales
$1,410,408.58
*226 The computation employed by petitioners in computing the reported gross sales of Juneau for 1947 was as follows: Total Bank Deposits
$1,658,517.17
Plus: Credits, Wisconsin Cold
83,980.03
Storage
$1,742,497.20
Less: Loans [1]
$270,569.50
Advance, Liqua-Dry Milk Co.
42,071.50
F. J. Stokes (refund)
3,497.81
Coons-Huenneken (refund)
8,813.14
Dale Dorn (note)
$ 1,213.50
Wartenbee (loans)
3,399.00
C. H. Electric (refund)
299.00
My Try (2 check refunds)
300.00
Wind damage payment
150.00
Crown Can (refund)
172.59
$ 330,486.04
$1,412,011.16
Adjustment for accounts
receivable
Balance 1- 1-47
$22,970.81
Balance 12-31-47
21,675.26
1,295.55
Total Sales
$1,410,715.61
n1 Loans: Bank of Mauston
$ 57,000.00
Bank of Mauston
24,000.00
Employees
40,000.00
F. J. Moran
10,000.00
H. G. Steiner
22,500.00
Wisconsin Cold Storage
117,069.50
$270,569.50
During 1946 sweetened condensed milk was in scarce supply because of its large sugar content. In that year the petitioner entered into an arrangement with Samuel Green, sometimes in the record *227 and sometimes hereinafter referred to as Sam Green, the terms of which are not disclosed by the record, whereby petitioner authorized Green to submit orders for products produced by Juneau. Green resided in Chicago and was employed as a salesman for S. Gumpert Company. In 1946 Fred Boyd, who also was a salesman for S. Gumpert Company, was engaged in selling ice cream, fruits, extracts, and supplies in his territory consisting of Oklahoma and a part of Texas, and resided in Dallas, Texas. At a convention held in St. Louis, Missouri, about April 1946, Green, whom Boyd had known for about 3 years, inquired of Boyd if the latter could sell some sweetened condensed milk, to which Boyd replied that he could. Green informed Boyd that he could furnish him 9 or 10 carloads, the source of supply being a creamery in Wisconsin, the name of which Green did not disclose to Boyd at that time. Subsequently Green entered into an arrangement with Boyd under which the latter during 1946 obtained from various firms in Texas and Oklahoma orders for sweetened condensed milk totaling 9 or 10 carloads. Under the arrangement between Green and Boyd, the latter upon obtaining an order for a specified quantity *228 of sweetened condensed milk at a specified price, also would collect from the customer a certain portion of the sales price of the order as a down payment on the order. Of the amount so collected Boyd retained a certain portion as his commission for obtaining the order, informed Green of the order, and sent him his (Boyd's) personal check payable to Green for the remainder of the amount collected. Thereafter the petitioner fully or partially filled the order by a shipment direct to the customer of sweetened condensed milk produced by Juneau and collected directly from the customer the portion of the sales price due on the shipment which Boyd had not collected at the time of obtaining the order. Although originally Green did not disclose to Boyd the name of the creamery that would supply the sweetened condensed milk, he did inform Boyd during the period when the latter was obtaining orders that the source of supply was Juneau Creamery operated by petitioner. Among those from whom Boyd obtained orders under his arrangement with Green was Ideal Baking Company, Tyler, Texas. At the time of obtaining the order the baking company made a down payment thereon in the amount of $2,029.50 by *229 check dated September 21, 1946, drawn payable to "Harold Steiner, D/B/A Juneau County Creamery and signed for you by Fred W. Boyd." Boyd endorsed the check "Harold Steiner, Juneau County Creamery. Fred W. Boyd" and deposited it in his personal bank account. Of the down payment Boyd remitted $1,522.12 thereof to Green by his (Boyd's) personal check dated September 23, 1946. The difference between the amount of the down payment, $2,029.50, and the amount remitted to Green, $1,522.12, or $507.38, was retained by Boyd as his commission for obtaining the order. Pursuant to the order obtained by Boyd, Juneau under invoice date of October 30, 1946, shipped 53 barrels of sweetened condensed skim milk to the baking company. The invoice showed the shipment as consisting of "31,571# net (a) .16( $5,051.36." Following the shipment some correspondence ensued between the baking company and Juneau wherein the latter took the position that Boyd did not represent it and never had, nor did he have any authority to accept or to cash any checks made payable to it. Pursuant to request of Juneau, the baking company furnished it a copy of the "contract on the car [of] milk" and a copy of the check for *230 the down payment of $2,029.50 and in addition furnished Boyd's address in Dallas, Texas. Thereupon Juneau Creamery on November 18, 1946, deposited in its checking account with the Bank of Mauston a check dated November 8, 1946, issued by the baking company and made payable to the order of Juneau in the amount of $3,021.86, representing the difference between the invoice price of $5,051.36 and the down payment of $2,029.50, and issued to the baking company a receipted invoice in which the amount of $2,029.50 was shown as "Less credit allowance" against the amount of the invoice, $5,051.36, leaving a balance due as $3,021.86. The "Sales Book" of Juneau discloses the following entries respecting the sale of the carload of milk to the baking company: 1946
Oct. 30
53 Bbls. sc. skimmilk
31,571# $.16
$5,051.36
Less: Cr. allowance
2,029.50
$3,021.86
Nov. 8
By ck.
$3,021.86 There is no showing in the record as to why, if Boyd's action with respect to the carload of condensed milk and the down payment thereon were unauthorized, the milk was shipped by Juneau to the baking company or why, under the circumstances shown, the amount of $2,029.50 was *231 entered on the sales book of Juneau as a credit allowance instead of as a down payment or as a prior payment on the carload of milk. Except for the above-mentioned carload of milk the baking company never made any purchases from Juneau Creamery. Also included among those from whom Boyd obtained orders under his arrangement with Green was the W. D. Wright Produce Company, Hobart, Oklahoma. Upon receiving an order from that company for 33,825 pounds of sweetened condensed milk at $15.50 per hundred pounds, f.o.b., Mauston, Wisconsin, Boyd also received from the company a check dated August 20, 1946, payable to Boyd's order in the amount of $2,029.50 as a down payment on the order. A copy of the order placed in evidence contains the following statement: "Receipt of $2,029.50 is hereby acknowledged. Balance of $9.50 per 100 lbs. due when shipment received. Fred W. Boyd." Of the down payment Boyd remitted $1,353 thereof to Green by his (Boyd's) personal check dated September 6, 1946, and retained the remainder, $676.50, as his commission for obtaining the order. Pursuant to the order obtained by Boyd, Juneau made a shipment of sweetened condensed skim milk to W. D. Wright Produce Company *232 and under date of September 12, 1946, issued to that company its invoice therefor which contained the following: Sept. 12
53 Bbls. Sweetened Cond. Skimmilk
32,764# net (a) $9.50
$3,112.58 Following delivery of the milk, W. D. Wright Produce Company forwarded its check dated October 5, 1946, in the amount of $3,048.92 to Juneau as payment of the balance of the purchase price of the milk. On October 10, 1946, Juneau Creamery deposited the check in its checking account with the Bank of Mauston. The sale of the milk and payment therefor was recorded in the Sales Book of Juneau as follows: 1946
Sept. 12
53 Bbls. sc. skimmilk
32,764#
$9.50
$3,112.58
Oct. 5
By ck
$3,048.92
Total
$3,048.92 Aside from the foregoing purchase of sweetened condensed milk, W. D. Wright Produce Company never made any purchases from Juneau. Others from whom Boyd in 1946 obtained orders for condensed sweetened milk under his arrangement with Green and to which Juneau made shipments of such milk were: Lilly I.C. Company, Commerce, Texas; Ideal Bakery, Paris, Texas; Mid-West Creamery Company, Ponca City, Oklahoma; Roselawn Dairy, Muskogee, *233 Oklahoma; V. Vandervoort's Creamery, Sweetwater, Texas; and Alamo Manufacturing Company, Brownwood, Texas. Under his arrangement with Green whereby he remitted to the latter a portion of the down payments received by him on orders for sweetened condensed milk obtained by him, Boyd during 1946 by checks drawn on his personal account with Dallas National Bank remitted the following amounts to Green: Check
Date of Check
No.
Payee
Amount
July 16, 1946
Sam Green
$1,691.25
July 18, 1946
Spl. 2
Sam Green
1,691.25
Sept. 6, 1946
Spl. 5
Sam Green
1,353.00 [1]
Sept. 9, 1946
Spl. 6
Sam Green
1,691.25 [1]
Sept. 21, 1946
Spl. 7
Sam Green
1,522.12 [1]
Sept. 23, 1946
Spl. 8
Sam Green
1,522.12
Dec. 16, 1946
Sam Green
200.00
$9,670.99
During 1946 Juneau purchased merchandise from West Union Co-operative Creamery Company, West Union, Iowa. Prior to the sale of the merchandise by that company, Juneau on April 4, 1946, made a payment of $2,000 to the company as a bond or guarantee to insure the payment of merchandise to be purchased on credit. By a check dated *234 May 31, 1946, and after Juneau had paid in full for all merchandise purchased from the company, the company remitted to Juneau the $2,000 Juneau previously had paid as a bond or guarantee. The $2,000 so received by Juneau was deposited on June 1, 1946, in its bank account with the Bank of Mauston. The $2,000 payment made on April 4, 1946, by Juneau to the company as a guarantee or bond was recorded on the books and records of Juneau as merchandise purchased and was deducted as such by petitioners on their Federal income tax return for 1946. In the computation of the gross sales of Juneau for 1946, as reported by the petitioners on their Federal income tax return for that year, an adjustment was made eliminating from the total deposits made during 1946 by Juneau in its bank account with the Bank of Mauston the foregoing $2,000 received by Juneau from the company. As a result of the foregoing treatment of the $2,000 the cost of merchandise sold by Juneau during 1946 as reported in the Federal income tax return of the petitioners for that year was overstated by $2,000 and as a consequence the net income reported by petitioners in their return for that year from Juneau was understated *235 by a like amount. Also during 1946 Juneau purchased merchandise from Fayette Mutual Creamery Association, Fayette, Iowa. Prior to the sale of the merchandise by the association to Juneau the latter on April 19, 1946, made a payment of $3,000 to the association as a bond or guarantee to insure payment for the merchandise to be purchased on credit. By a check dated June 14, 1946, and after Juneau had paid in full for all merchandise purchased from the association, the latter remitted to Juneau the $3,000 Juneau previously had paid as a bond or guarantee. The $3,000 so received by Juneau was deposited on June 17, 1946, in its bank account with the Bank of Mauston. The payment of $3,000 made by Juneau to the association on April 19, 1946, as a guarantee or bond was recorded as merchandise purchased on the books and records of Juneau and was deducted as such by petitioners on their Federal income tax return for 1946. In the computation of the gross sales of Juneau for 1946, as reported by petitioners on their Federal income tax return for that year, an adjustment was made eliminating from the total deposits made during 1946 by Juneau in its bank account with the Bank of Mauston the above-mentioned *236 $3,000 received by Juneau from the association on June 14, 1946. As a result of the above-mentioned treatment of the $3,000 the cost of merchandise sold by Juneau during 1946 as reported in the Federal income tax return of the petitioners for that year was overstated by the $3,000 and as a consequence the net income reported by petitioners in their return for that year was understated by a like amount. In 1951 the petitioner employed McDonald, Sprague and Company, sometimes hereinafter referred to as McDonald Sprague, a firm of public accountants, to make an analysis of the "recorded" cash receipts and disbursements and other supporting data of Juneau for the years ended December 31, 1945, 1946, and 1947. Thereafter and prior to September 21, 1951, McDonald Sprague made such analysis for the respective years. The underlying examination upon which the analyses were made covered only what was recorded on the books of Juneau. No attempt was made to verify with banks, creditors, or debtors any amounts appearing on the books of Juneau, nor was any examination made of any records of the petitioner other than the records of Juneau. Despite the fact that the books and records maintained *237 for Juneau showed that the above-mentioned amount of $2,000 paid by Juneau to West Union Co-operative Creamery Company in April 1946 and the $3,000 paid by Juneau to Fayette Mutual Creamery Association also in April 1946 as guarantees or bonds to insure the payment by Juneau of merchandise to be purchased by it on credit were returned by those firms to Juneau approximately 2 months later in 1946, McDonald Sprague in its report for 1946 for undisclosed reasons treated the total of the two amounts, $5,000, as a liability of Juneau as of December 31, 1946, described such liability as "Advances on future sales," and, in its report for 1947, treated the $5,000 as representing sales made by Juneau in 1947. During 1947 Juneau ordered a carload of sugar through the brokerage firm of Coons-Huennekens Company, which was engaged in the business of representing refiners in the sale of sugar. After Juneau had been billed for the carload of sugar, but before delivery, Coons-Huennekens Company, at the direction of the petitioner, sold and transferred the carload of sugar to another buyer on October 8, 1947. On October 16, 1947, Juneau made payment in the amount of $8,813.14 to the refiner (shipper) *238 for the carload of sugar which had been transferred and sold to another buyer. Such payment was recorded on the books and records of Juneau as merchandise purchased and was deducted as such by petitioners on their Federal income tax return for 1947. By a cashier's check in the amount of $8,813.14 dated October 15, 1947, Coons-Huennekens Company reimbursed Juneau for the payment it made for the carload of sugar which had been sold and transferred to another buyer. The reimbursement in the amount of $8,813.14 received by Juneau from Coons-Huennekens Company was deposited on October 16, 1947, by Juneau in its checking account with the Bank of Mauston. In the computation of the gross sales of Juneau for 1947, as reported by the petitioners on their Federal income tax return for that year, an adjustment was made eliminating from the total deposits made during 1947 by Juneau in its account with the Bank of Mauston the foregoing amount of $8,813.14 received by Juneau from Coons-Huennekens Company. About June 1946, the petitioner employed W. Don Olson as office manager of Juneau and Olson thereafter continued in such employment through 1947. Olson died about 1953 or 1954. The petitioner *239 was in Miami, Florida, in February 1947. While there and during a telephone conversation with Olson, the petitioner instructed Olson - to deposit all the cash that was available in the safe in the bank and to show it on our records so that there would be no question as to tax liabilities and so on and so forth, because I wanted no trouble. Thereafter, on February 11, 1947, $24,000 in cash was deposited in Juneau's checking account with the Bank of Mauston and was entered on the books and records of Juneau as the proceeds of a loan obtained from the bank at the time the $24,000 was deposited. The $24,000 constituted proceeds from sales, not recorded on the books of Juneau, of products produced by Juneau which proceeds prior to the time of deposit were kept in the "revolving fund" maintained by petitioner in connection with the business operations of Juneau. In the computation of the gross sales of Juneau for 1947, as reported by petitioners on their Federal income tax return for that year, an adjustment was made eliminating from the total deposits made during 1947 by Juneau in its bank account with the Bank of Mauston the foregoing $24,000. The petitioners did not report the $24,000 *240 as income in their income tax return for 1947. In 1947 Arnold R. Kahler, then a deputy collector and subsequently a revenue agent, was assigned to make an investigation of the income tax liability of the petitioners for 1945 and 1946. After the income tax return of the petitioners for 1947 had been filed, the investigation was extended to include the income tax liability of the petitioners for that year. The investigation extended over a period commencing in July 1947 and ending in 1954. Erwin R. Haas, a special agent, was assigned to the investigation in July 1947 and participated in it until June 1949. Joseph N. Koehn, a special agent, alo was assigned to the investigation from June 1948 until June 1949. Subsequently additional information became available. Thereupon the investigation was reopened and Koehn again participated in the investigation. At various times during the period the income tax liability of the petitioners for the years in issue was the subject of investigation by the respondent and later the subject of controversy between the respondent and petitioners, the petitioners have been represented by a total of eight different persons, including the attorney appearing *241 herein for them. During the respondent's investigation of the income tax liability of the petitioners for the years in issue and on July 20, 1948, respondent's agents Koehn and Kahler questioned the petitioner about a check from Russell Creamery Company dated December 31, 1946, for $8,189 which had been deposited in petitioner's personal bank account. Petitioner stated that the money employed by him in the transaction with respect to which the check had been received was currency taken from the revolving fund. He further stated that during the years under investigation in order for him to stay in business, it was necessary for him to pay over-ceiling prices for sugar, that he likewise, when sales were made, collected over-ceiling prices, and the cash was a revolving fund kept to pay out over-ceiling prices and what was reimbursed on the collection. On the following day when agents Koehn and Kahler questioned the petitioner about the above-mentioned deposit of $24,000 in cash on February 11, 1947, in Juneau's account with the Bank of Mauston, the petitioner first stated that the amount represented the proceeds of a loan obtained from the Bank of Mauston. After having been informed *242 by the agents that the records of the bank did not disclose any loan of $24,000 made on that date, the petitioner stated: This is what you are looking for, the $24,000 in currency came from the revolving fund maintained in the office safe here in the office and was deposited into the bank's records to the account of Juneau County Creamery when the company was in need of funds. The petitioner stated to the agents they could put the $24,000 in income in any year they wished and that maybe it should be spread over all years. The petitioner further stated to the agents he did not care what tax liability they set up against him and that - I had connections in Washington to get at the sugar I wanted when the O.P.A. was in effect and those same connections will work for me now. McDonald Sprague in its report for 1947 observed that the above-mentioned $24,000 was recorded on the books of Juneau as a loan. In its report McDonald Sprague then reduced that amount by $1,200 which it concluded represented the proceeds from the sale of a truck and treated the remainder, $22,800, as "unidentified income" of Juneau for 1947. The books and records maintained by petitioners for the years 1945, *243 1946, and 1947 were inadequate for fairly or correctly reflecting the income of the petitioners for those years. In determining the deficiencies for the years in issue the respondent determined the taxable net income of the petitioners for the respective years by the use of increases in net worth of the petitioners, plus personal and nondeductible expenditures with an adjustment for the nontaxable portion of long-term capital gains. In so doing the respondent determined that the taxable net income and the unreported income of the petitioners were in the following amounts for the indicated years: 1945
1946
1947
Taxable net
income
$61,610.38
$148,790.77
$118,117.21
Unreported
income
56,096.90
104,769.96
107,626.31
In his amended answers the respondent asserts that the taxable net income and the unreported income of the petitioners computed as above-stated for the indicated years were as follows: 1945
1946
1947
Taxable net
income
$50,846.05
$148,371.81
$128,306.56
Unreported
income
45,332.57
104,351.00
117,815.66
In the income tax returns filed by him with the State of Wisconsin for the years 1934 through 1944 *244 the petitioner reported total income as follows: Year
Amount
1934
$ 2,334.13
1935
3,465.00
1936
3,721.93
1937
3,019.87
1938
3,520.18
1939
2,335.70
1940
2,433.47
1941
$ 3,326.59
1942
3,592.52
1943
5,198.07
1944
5,731.77
Total
$38,679.23
The following is a statement of the loans made by the Bank of Mauston to petitioner, the repayments thereof, and the balance of the loans outstanding during the period beginning December 6, 1940, and continuing through December 31, 1944. All of the loans bore interest at the rate of 5 percent per annum and all of the loans except that of December 6, 1940, were collateralized: Balance
Date
Amount
Date
Amount
Out-
of Loan
of Loan
Repaid
Repaid
standing
12/ 6/40
$ 5,000
$ 5,000
3/ 4/41
3,000
8,000
6/12/41
$5,000
3,000
6/12/41
5,000
8,000
6/18/41
3,000
5,000
7/18/41
3,000
8,000
7/31/41
3,000
5,000
9/ 5/41
3,000
8,000
9/15/41
1,000
7,000
9/20/41
1,000
6,000
10/17/41
1,000
5,000
1/ 6/42
5,000
0
1/ 6/42
5,000
5,000
7/11/42
5,000
0
7/ 6/42
5,000
5,000
10/ 9/42
300
4,700
10/10/42
700
4,000
2/19/43
4,000
0
2/19/43
4,000
4,000
3/ 5/43
4,000
0
8/11/43
5,000
5,000
11/20/43
10,000
15,000
1/31/44
5,000
10,000
1/31/44
2,500
7,500
4/11/44
1,500
6,000
5/27/44
6,000
0
5/26/44
6,000
6,000
7/10/44
500
5,500
8/11/44
5,500
0
11/15/44
7,160
7,160
*245 On January 2, 1945, the petitioner sold his interest in the Steiner & Moran Partnership, heretofore mentioned, to his partner therein, Frank J. Moran, for $2,279.06. At the close of December 31, 1944, the petitioner owned stocks and bonds acquired during the period 1938 through November 6, 1944, which, together with the cost of his interest in Steiner & Moran Partnership, $800, had a total cost in excess of $33,000. In addition the petitioner also owned real estate, land, and buildings acquired during the period 1935 through 1939 at a total cost of more than $9,000. At a meeting on July 18, 1947, of petitioner and respondent's agents Kahler and Haas, the latter asked the petitioner for a net worth statement to which the petitioner replied that everything was stated on his return and that he would not have time to get a net worth statement. At the same meeting Haas asked petitioner if he had ever received any inheritances or gifts. Petitioner replied that he had received $3,000 [1] as a gift from his grandmother in 1922 but had never received any other gifts or inheritances. *246 By letter dated April 23, 1948, respondent's agent Kahler requested that in order to expedite the examination of petitioner's income tax liability the petitioner prepare, sign, and mail to Kahler a financial or net worth statement listing in detail his year-end assets and liabilities for the period beginning January 1, 1941, and ending December 31, 1947. Thereafter, in a letter to Kahler dated May 20, 1948, the petitioner replied that for several weeks he had been attempting to determine his financial status as of December 31, 1941, and did not think it was possible to get an accurate financial statement as of that date since he had never prepared any detailed financial statement for himself, or for the bank, or for anyone else; that it was difficult to ascertain his net worth for 1941 from the records he still had of his business operations; that he could furnish a detailed statement of his net worth as of December 31, 1947, if desired; and that while he would cooperate with Kahler in obtaining what the latter desired, he, petitioner, did not feel that it was his obligation to spend the time required to do the work himself. Thereafter, on July 6, 1948, and at a meeting of agents *247 Koehn and Kahler with the petitioner, the petitioner presented to Koehn a statement of his assets and liabilities as of December 31, 1947, only, which the petitioner signed and swore to before Koehn at the time of the meeting. Koehn explained to petitioner that the statement would be used in an audit of his (petitioner's) income tax returns. Koehn also asked petitioner to furnish net worth statements covering prior years to which the petitioner replied that he would not furnish them because he did not have time to prepare them. In the statement of petitioner's assets and liabilities as of December 31, 1947, the petitioner showed his cash on hand as of that date as $10,900. Upon being questioned by Koehn as to how he arrived at the foregoing amount the petitioner replied that based on his recollection the amount was the best estimate he could make at that time and that he (petitioner) had no records as to his cash on hand on December 31, 1947. During the time the Penal Division of the Internal Revenue Service was considering the question of possible criminal violations by petitioner with respect to his Federal income tax returns filed for 1945, 1946, and 1947, an attorney then authorized *248 to represent the petitioner submitted to representatives of the Penal Division statements purporting to show the net worth of the petitioner as of December 31, 1944, and December 31, 1947. These statements were signed and sworn to by petitioner on January 12, 1952. On the statement with respect to December 31, 1944, the petitioner showed cash on hand on that date in the amount of $15,500 and on the statement with respect to December 31, 1947, petitioner showed cash on hand on that date in the amount of $11,773. Subsequently the petitioner on February 17, 1958, executed an affidavit which shortly thereafter the petitioner submitted to the Internal Revenue Service through his attorney appearing herein. The affidavit reads, in part, as follows: HAROLD G. STEINER, being first duly sworn on his oath deposes and says that he resides at Mauston, Juneau County, Wisconsin; and That in connection with the examination of his books and records by the Internal Revenue Service for the years 1945 and 1946 it is alleged by the said Internal Revenue Service that certain payments made by your Affiant in the year 1945 for life insurance premiums in the alleged amount of $22,569.49 and the purchase *249 of United States Treasury bonds in November of 1945 in the alleged amount of $6,000.00 is, according to the allegations of the Internal Revenue Service, from funds obtained by your Affiant from alleged understated sales which had not theretofore been reported for income tax purposes and therefore there is an alleged tax due on said items, and which allegations regarding understated sales is not correct; and That your Affiant, knowing full well that said expenditures did not arise from alleged unreported sales obtained during the taxable year ended December 31, 1945 for which income tax is allegedly due the United States Government makes this affidavit to present the facts necessary to demonstrate the source of funds available to your Affiant with which said expenditures were made: 1. Your Affiant was given $50,000.00 in late 1942 by your Affiant's relative Otto Blanke. Otto Blanke formerly resided at 1502 South 76th Street, West Allis, Wisconsin, and owned and operated for many years the Blanke Clothing Store at 61st Street and Greenfield, West Allis, Wisconsin. Mr. Blanke was formerly married to Anna Steiner Blanke who died on December 25, 1929. Mr. Blanke remarried Eleanor Fuchs *250 some time around 1936 or 1937. In 1942 Mr. Blanke advised your Affiant that he desired to make a gift to your Affiant inasmuch as he had promised his first wife on her deathbed that he would always take care of your Affiant and Mr. Blanke advised your Affiant that in view of his remarriage he was apprehensive over whether or not any money would ultimately be left for your Affiant, and he asked your Affiant to take the money and not to say anything to anyone about it. The money was placed by your Affiant in a safety deposit box at the Bank of Mauston, Wisconsin. Subsequent to the date of his remarriage, Mr. Blanke moved and thereafter lived at a residence on Granada Boulevard in Coral Gables, Florida, and passed away some time in 1944, the exact date of his death being unavailable to your Affiant at this time. Mr. Blanke died at Miami, Florida. According to information available to your Affiant, it is understood his second wife has since remarried; and 2. That your Affiant, subsequent to the death of Mr. Blanke thereafter felt he was entitled to use the money and said money was used in part for the expenditures in 1945 for the said life insurance premium and the United States Treasury *251 bonds; and 3. That in addition to the aforesaid sum of money, during the year 1945 your Affiant also had available to him funds in the amount of $6,400.00 from the sale of his interest in the Steiner-Moran partnership which included not only the assets of the store but the building in which your Affiant owned 100%, all of which has been heretofore reported to and investigated by the Internal Revenue Service; * * * Anna Steiner, an aunt of petitioner, married Otto Blanke. Several years thereafter and in 1929 she died. In 1933 Otto first met Eleanor Fuchs whom he married in October 1936. After their marriage they lived in a house owned by Otto situated in West Allis, Wisconsin, until 1940 when they purchased a home in Florida located at 516 Sevilla Avenue, Coral Gables. They then moved to Florida and lived in their Sevilla Avenue, Coral Gables home, and not elsewhere in Florida, until Otto's death. Otto continued to own his West Allis, Wisconsin, house until his death. On November 17, 1941, Otto entered Columbia Hospital, Milwaukee, Wisconsin, suffering from heart and dropsy conditions with which he was affected. He remained in the hospital until December 27, 1941, when he was *252 released. Immediately upon being released from the hospital, Otto was driven by automobile directly to his West Allis, Wisconsin, house. Otto remained confined to the house to recuperate and was attended by his physician who regularly made professional calls to see him. On or about March 17, 1942, the physician advised Otto that he was able to travel to Florida. Thereupon Otto and Eleanor left West Allis by automobile and directly returned to their home in Coral Gables, with Eleanor doing the time Otto was confined to his West Allis house until his departure for Florida, he did not leave his house and Eleanor was with him throughout that period. Pursuant to the advise o a physician, Otto had not driven an automboile for serveral years prior to the time he entered Columbia Hospital on November 17, 1941. After returning to his Florida home following March 17, 1942, Otto made no other trips and died in Florida on July 22, 1942. Otto Blanke did not file a Federal gift tax return for the years 1940 and 1941. The petitioner did not file an information Federal gift tax return, as donee, for the years 1940 and 1941. The records of the Assessor of Incomes, Eau Claire district of the Wisconsin *253 Department of Taxation, disclose that no Wisconsin gift tax returns were filed by petitioner, as donee, for the years 1940 and 1941. Contained on or near the top of page 1 of the State of Wisconsin income tax return filed by the petitioner for 1940 is a section or block entitled "Gift Tax Information." In the section or block appears the question: "From whom did you receive a gift in 1940?" and underneath the question is the following: "Estimated Value of Gift $ ." Except for the years involved identical sections or blocks with identical wordings therein are contained in the State of Wisconsin income tax returns filed by the petitioner for 1941 and 1942. In none of the spaces so provided in the returns for the 3 years did the petitioner report a gift received from Otto Blanke or anyone else or report any estimated value of any gift. The petitioner had cash on hand as follows on the indicated dates: 12/31/44
12/31/45
12/31/46
12/31/47
$1,000.00
$1,000.00
$14,912.95
$10,900.00
In determining the deficiencies in issue the respondent determined that petitioner had cash on hand in the foregoing amounts on the indicated dates. The petitioner had the following *254 amounts on deposit in his personal checking account with the Bank of Mauston on the indicated dates: 12/31/44
12/31/45
12/31/46
12/31/47
$1,031.49
$2,131.46
$22,309.75
$479.11
On December 31, 1944, the petitioner had $2,634.83 on deposit with the Bank of Mauston in a checking account designated "Wisconsin Casine Company, Harold G. Steiner Account." In his checking account in the name of Juneau County Creamery with the Bank of Mauston the petitioner had on deposit on December 31, 1945, the amount of $4,495.37, had on December 31, 1946, an overdraft of $38,317.20, and had on December 31, 1947, an overdraft of $63,142.71. The petitioner had the following amounts on deposit in his personal checking account with the Bank of New Lisbon, New Lisbon, Wisconsin, on the indicated dates: 12/31/44
12/31/45
12/31/46
12/31/47
$244.17
$310.12
$284.45
$380.60
The petitioner had assets in the following amounts in the form of accounts receivable arising from the business operations of Juneau on the dates indicated: 12/31/45
12/31/46
12/31/47
$9,793.92
$22,973.33
$18,224.40
The petitioner had assets in the following *255 amounts in the form of notes receivable arising from the business operations of Juneau on the dates indicated: 12/31/46
12/31/47
$3,495
$450
The petitioner had an asset in the form of a note receivable due from Francis L. Sullivan and Elizabeth Sullivan in the following amounts on the indicated dates: 12/31/45
12/31/46
12/31/47
$3,500
$3,150
$3,150
On the following dates the petitioner had inventories in connection with the operation of Juneau in the indicated amounts: 12/31/45
12/31/46
12/31/47
$8,979.88
$45,736.52
$202,043.70
The petitioner had assets in the form of investments including stocks and bonds in the following total amounts on the indicated dates: 12/31/44
12/31/45
12/31/46
12/31/47
$33,146.34
$31,298.84
$31,336.34
$39,336.34
On February 14, 1935, the petitioner acquired improved realty consisting of land and a building thereon described as "Lot No. 6, Block 4, S & M Bldg.," New Lisbon, which he continued to own until he sold it on June 30, 1945, to Frank J. Moran and his wife for $4,120.94. The foregoing property constituted an asset of the petitioner on December 31, 1944, as *256 follows: Land
$ 500.00
Building
4,380.40
Total
$4,880.40
Petitioner acquired on May 21, 1938, improved realty consisting of land and a building thereon described as "Lot No. 9, Block 4, Tessmer Tavern," New Lisbon, which he continued to own until he sold it on June 30, 1946, to Frank J. Moran and his wife for $6,000. On February 1, 1939, petitioner caused improvements to be made on the building at a cost of $1,410. The foregoing property constituted an asset of the petitioner on December 31, 1944, and December 31, 1945, as follows: 12/31/44
12/31/45
Land
$ 500
$ 500
Building
3,000
3,000
Building improvements
1,410
1,410
Total
$4,910
$4,910
On April 1, 1946, the petitioner acquired improved realty consisting of land and a building thereon and described as "Union Center Plant." The foregoing property constituted an asset of the petitioner on December 31, 1946, and December 31, 1947, as follows: 12/31/46
12/31/47
Land
$ 500
$ 500
Building
3,000
3,000
Total
$3,500
$3,500
The petitioner acquired on October 11, 1945, land described as "Lot No. 13 Bock L. Garage" which was purchased from John R. Smith *257 at a cost of $1,500. The property constituted an asset of the petitioner as follows on the indicated dates: 12/31/45
12/31/46
12/31/47
$1,500
$1,500
$1,500
On October 8, 1946, the petitioner purchased from Gretchen Holgate at a cost of $300 land described as "Lot No. 13 Block L. Garage." The property constituted an asset of the petitioner as follows on the indicated dates: 12/31/46
12/31/47
$300
$300
The petitioner caused a garage building to be erected and completed on January 2, 1947, at a cost of $8,364.81 during 1946 and a cost of $10,328.32 during 1947 and had an asset in the form of a garage as follows on the indicated dates: 12/31/46
12/31/47
$8,364.81
$18,693.13
On February 16, 1945, the petitioner acquired improved realty consisting of land and building thereon described as "Juneau County Creamery" and thereafter continued to own the property through 1947. The property constituted an asset of the petitioner as follows on the indicated dates: 12/31/45
12/31/46
12/31/47
Land
$ 673.11
$ 673.11
$ 673.11
Building
6,486.35
6,486.35
6,486.35
Total
$7,159.46
$7,159.46
$7,159.46
*258 During 1947 the petitioner caused capital improvements to be made to the Juneau County Creamery building at a cost of $16,675.55 as follows: 1947
Amount
June 1
$ 7,745.06
July 1
1,691.76
August 1
548.00
September 1
5,232.34
October 1
221.25
November 1
233.73
December 1
1,003.41
Total
$16,675.55 The foregoing improvements constituted an asset of the petitioner in the amount of $16,675.55 on December 31, 1947. The useful life on the dates of acquisition of each of the following buildings was 33 1/3 years: S & M building, Tessmer Tavern building, Union Center Plant building, Garage building, and Juneau County Creamery building. The useful life of the improvements to Tessmer Tavern building was 32 1/3 years from the date made and the useful life of the improvements to Juneau County Creamery was 31 years from the dates made. At the time the petitioner acquired the above-mentioned Juneau County Creamery property (land and building) on February 16, 1945, he also acquired at a cost of $5,078.93 the equipment then used in the operation of the creamery. The foregoing equipment constituted an asset of the petitioner on the following dates in the indicated *259 amounts: 12/31/45
12/31/46
12/31/47
$5,078.93
$5,078.93
$5,078.93 The useful life of the equipment at the time of acquisition by petitioner was 20 years. Subsequently during 1945 and during 1946 and 1947 the petitioner made disbursements for numerous items of additional equipment on the dates and at the costs shown on pages 12-14 of Exhibit F, an exhibit placed in the record by stipulation of the parties, totaling $28,968.70 for 1945, $21,524.21 for 1946, and $56,167.12 for 1947. As a result of the foregoing disbursements the petitioner had assets in the form of additional equipment on the following dates in the indicated amounts: 12/31/45
12/31/46
12/31/47
$28,968.70
$509,492.91
$106,660.03 The useful life of the items of additional equipment on the dates of the expenditures therefor was 20 years. Prior to and during 1945, 1946, and 1947, the petitioner made disbursements for various trucks and automobiles on the dates and at the costs set forth in Exhibit F, page 15. On the following dates the petitioner had assets in the form of trucks and automobiles in the indicated amounts: 12/31/44
12/31/45
12/31/46
12/31/47
$3,088.11
$4,933.25
$12,306.58
$20,468.96
*260 The useful life of the trucks and automobiles on the dates of the expenditures therefor was 4 years. During 1946 and 1947 the petitioner made disbursements for a truck milk tank, a van, milk vans, and truck bodies, collectively referred to as "truck bodies," on the dates and in the amounts set forth in Exhibit F at page 16. On the following dates the petitioner had assets in the form of "truck bodies" in the indicated amounts: 12/31/46
12/31/47
$1,820.00
$4,211.14 The useful life of the "truck bodies" on the dates of the expenditures therefor was 4 years. On December 31, 1947, the petitioner had an asset in the form of a boat acquired at a cost of $3,000. During 1947 and until the time of his death in July of that year, John Thoma and his wife Elizabeth Thoma, were engaged in the conduct of a tavern business in Milwaukee, Wisconsin, known as Town Hall Tavern. The business and the furniture and fixtures employed therein were owned by Town Hall Tavern, Inc., of which John Thoma and Elizabeth Thoma were the principal if not the sole stockholders and of which Elizabeth Thoma was president. Following the death of John Thoma, Elizabeth Thoma continued to be engaged *261 in the conduct of the business until the end of 1947. Shortly after the death of John Thoma and prompted in part by an indebtedness owing by him at the time of his death and by an indebtedness owing by Town Hall Tavern, Inc., and the need of money to forestall the pressing claims of creditors, Elizabeth Thoma decided to sell the business of the corporation with its furniture and fixtures used therein and to sell the realty which she owned and which was employed in the conduct of the business. Abe R. Becker, an attorney duly licensed to practice law in the State of Wisconsin, and secretary of Town Hall Tavern, Inc., was appointed by the corporation to represent it as a broker in obtaining a purchaser for its properties employed in the conduct of the business and also was employed by Elizabeth Thoma to act in a like capacity for her with respect to the sale of the realty employed in the conduct of the business. Upon learning that the Town Hall Tavern business and the properties employed therein were for sale, John J. Steiner and also his son John Milton Steiner, who either then was working in the business or theretofore had worked in it, inquired of petitioner as to whether he knew *262 of a prospective purchaser for the business and properties. Subsequently and on October 31, 1947, an instrument drafted by Becker and entitled "AGREEMENT TO PURCHASE TAVERN BUSINESS" was executed by Town Hall Tavern, Inc., as seller, and John Milton Steiner, as buyer. The instrument contained the following provisions: WHEREAS, the Seller wishes to sell the tavern business operated by it at 1714 West Center Street, Milwaukee Wisconsin, under the trade name-Town Hall Tavern; and, WHEREAS, the Buyer desires to purchase said business; THEREFORE, in consideration of the sum of Ten Thousand Dollars ($10,000.00) paid on this date to the Seller by the Buyer; The Seller agrees to do as follows: 1. To sell the entire tavern business, equipment, fixtures and good will to the Buyer, at 1714 West Center Street, Milwaukee, Wisconsin, for a price of Twenty Thousand Dollars ($20,000.00), payable in the following manner: (a) The sum of Ten Thousand Dollars ($10,000.00) to be paid to Seller on the date of this agreement; and, (b) The balance of Ten Thousand Dollars ($10,000.00) to be paid on the date of the closing of the sale as orally agreed, not to be later than December 31, 1947. *263 2. To sell such stock as the Buyer desires at inventory value. 3. To permit Buyer to use the trade name: Town Hall Tavern, or Town Hall Tonite. 4. To pay off all debts on all fixtures, stock, and equipment prior to closing date above. The Buyer agrees to do as follows: 1. To purchase said tavern mentioned herein on the above terms and conditions, and to purchase any stock he desires. The foregoing instrument bears the signatures of John J. Steiner and Becker, as witnesses. On October 31, 1947, John Milton Steiner, as buyer, executed an instrument drafted by Becker and entitled "REAL ESTATE SALES AGREEMENT" wherein he offered to purchase the realty employed in the tavern business at the price of $17,000, payable $11,000 "paid on the date of this agreement [October 31, 1947] and tendered herewith and the balance" of $6,000 "to be paid on the date of the closing of this sale, to be no later than sixty (60) days from the date hereof." The instrument provided that the sum of $11,000 "tendered as earnest money herein shall be retained as part payment on the purchase price if this offer is accepted on or before December 31, 1947." The instrument also provided that if the "offer *264 is accepted, the transaction is to be closed at the office of A. R. Becker on or before Dec. 31, 1947, or at such other time and place as may be designated in writing by the parties hereto." The instrument further provided that all "monies paid under this contract shall be used to clear title on the said property, balance to clear title on fixtures in tavern on premises" and that should "the undersigned Buyer fail to carry out this agreement, all money paid hereunder shall, at the option of the Seller, be forfeited and shall be retained by the Seller as liquidated damages, subject to deductions of broker's commission and disbursements." Elizabeth Thoma accepted the offer and signed her acceptance on the foregoing instrument. An instrument drafted by Becker and entitled "BILL OF SALE" conveying the tavern fixtures and equipment by Town Hall Tavern, Inc., to John Milton Steiner for the sum of $20,000 was executed on January 7, 1948, by the corporation by Elizabeth Thoma, as president, and by Becker, as secretary. The instrument bears the signatures of John J. Steiner and petitioner as witnesses. An instrument drafted by Becker and entitled "WARRANTY DEED" conveying the realty employed *265 in the Town Hall Tavern business to John Milton Steiner was executed by Elizabeth Thoma on January 7, 1948. The instrument bears the signatures of Joyce Goldstein and Becker as witnesses and Becker as Notary Public. The total sales price paid for the goodwill and business of Town Hall Tavern, Inc., and the furniture, fixtures, and realty employed in the business was $37,000. Of the total sales price, $21,000 was paid in cash on October 31, 1947, to Elizabeth Thoma at the time the instruments entitled "AGREEMENT TO PURCHASE TAVERN BUSINESS" and "REAL ESTATE SALES AGREEMENT" were executed. The petitioner delivered the above-mentioned $21,000 in cash to John J. Steiner, an uncle of petitioner, who in turn delivered it to Elizabeth Thoma. The remainder of the sales price, $16,000, was paid in cash by petitioner on December 29, 1947. John Milton Steiner did not purchase the above-mentioned Town Hall Tavern property either personalty or realty, in his own right but acted solely in the capacity as a nominee insofar as he was a party to the foregoing instruments and no part of the purchase price paid originated with him. At the time of his death John Thoma was indebted to John Milton *266 Steiner and such indebtedness was satisfied from the proceeds of sale of the Town Hall Tavern properties. Elmer F. Warnecke, a brother-in-law of the petitioners, and his wife Norma V. Warnecke executed a 4 percent interest-bearing promissory note dated January 4, 1948, for $10,500 due one year after date, payable to the order of petitioner or Ollie Mae Steiner, his wife. Thereafter, on January 12, 1948, Elmer Warnecke took charge of the operation of the Town Hall Tavern. Prior thereto Warnecke had made no inspection of the tavern and had seen it only casually one time on an undisclosed date in December 1947. Neither had he at any time discussed the purchase of it with Elizabeth Thoma, Becker, John J. Steiner, or John Milton Steiner, nor was he present during any of the negotiations held concerning its sale. Nor was he present when the sales price of Town Hall Tavern was paid. On December 17, 1948, and without receiving any money or other consideration therefor, John Milton Steiner executed a warranty deed conveying the realty employed in the operation of Town Hall Tavern to Elmer F. Warnecke and his wife Norma V. Warnecke. At a meeting on June 9, 1949, between the petitioner *267 and his then attorney Beznor and respondent's agents Haas and Koehn, the petitioner was asked if he would submit to questioning under oath and the taking of a question and answer statement. The petitioner replied that he had answered all of the questions asked him and that he saw no need to go all over it again. Agent Haas then mentioned that petitioner had not disclosed an investment in the Town Hall Tavern in Milwaukee. Petitioner replied that he had not been asked about that and that if he had been asked, he would have admitted an investment in the Town Hall Tavern and further stated that he did not know whether the investment was made in 1947 or 1948. On December 31, 1947, the petitioner had either an investment in Town Hall Tavern of $37,000, or an indebtedness owing to him of $37,000 on account of the sums of money he had furnished in payment therefor. At the close of December 31, 1947, the petitioner was indebted to Wisconsin Cold Storage Co., Milwaukee, Wisconsin, in the amount of $37,089.47 for loans made by that company to Juneau. Included in the $37,089.47 was a loan of $4,000 made on December 31, 1947, in the form of a check for $4,000 issued by the company to Juneau *268 which was deposited on January 6, 1948, in Juneau's checking account with the Bank of Mauston. The check for $4,000 was an asset of the petitioner at the close of December 31, 1947. On December 31, 1946, the petitioner had an asset in the amount of $5,000 represented by an advance payment for the purchase of equipment in the form of a vacuum drier. The petitioner had liabilities in the form of accounts payable in connection with the business operations of Juneau as follows on the indicated dates: 12/31/45
12/31/46
12/31/47
$10,893.33
$59,872
$85,511.47
On December 31, 1947, the petitioner had a liability of $27,046.50 for advances received from Liqua-Dry Milk Company. On the same date the petitioner had a liability in the amount of $23,000 representing an unpaid stock subscription. On the following dates the petitioner had liabilities in the indicated amounts for loans made to him by the Bank of Mauston: 12/31/44
12/31/45
12/31/47
$7,160
$20,000
$25,000
On the following dates the petitioner had liabilities in the indicated amounts for indebtedness due to George Steiner: 12/31/45
12/31/46
12/31/47
$14,000
$10,000
$10,000
*269 During 1945, 1946, and 1947 the petitioner made payments as follows for insurance premiums, which payments constituted personal and nondeductible expenditures: 1945
1946
1947
$22,569.49
$1,374.56
$1,758.07
During 1945, 1946, and 1947 the petitioner made payments as follows for Federal taxes, which payments constituted personal and nondeductible expenditures: 1945
1946
1947
$866.09
$2,230
$19,169.29
During the years 1945, 1946, and 1947 Eugene Crans was employed by petitioner as a buttermaker in the business operations of Juneau. For several years prior thereto he had been employed at the plant. Roland Steiner, a half-brother of petitioner, was employed by petitioner "more or less" as plant manager at Juneau during the years 1945 through 1947. Margaret Steiner, wife of Roland Steiner, was employed by petitioner as bookkeeper for Juneau during 1945 through 1947. W. Don Olson was office manager of Juneau from about June 1946 until the end of 1947. Frank Moran, a brother-in-law of petitioner, was employed by the latter as shipping clerk for Juneau from about May 1946 until the end of 1947. From about September 1946 until about January *270 1947 Aloysius Steiner, sometimes hereinafter referred to as Louie Steiner, an uncle of petitioner, was employed at Juneau. The services Louie Steiner performed consisted of picking up the mail in the morning, performing miscellaneous small jobs, and doing some of the milk testing when he was able. He was advanced in years, had been quite sickly all of his life, and was not able to do hard labor. Because of his physical condition he worked when he wanted to and when he did not want to work, he did not work. The record is silent as to the portion of the time during the period of his employment by petitioner that Louie Steiner worked or did not work. He died in 1961. During 1946 the petitioner made regular payments designated on the books of Juneau as salary and in the return of petitioners as wages, and sometimes hereinafter referred to as salaries, to the following employees in the amounts indicated and in addition made payments designated as bonuses on the books and records of Juneau, and sometimes hereinafter referred to as bonuses, to such employees in the indicated amounts: Employee
Salaries
Bonuses
Total
Eugene Crans
$2,435.00
$15,000
$17,435.00
Roland Steiner
2,435.00
15,000
17,435.00
Margaret Steiner
1,480.00
15,000
16,480.00
W. Don Olson
1,160.00
15,000
16,160.00
Frank Moran
1,138.20
10,000
11,138.20
Louie Steiner
800.00
10,000
10,800.00
Total
$9,448.20
$80,000
$89,448.20
*271 In their income tax return for 1946 the petitioners deducted as wages the amounts of salaries and bonuses shown above for the respective employees. Income tax and social security tax were withheld by petitioner from the bonuses. During 1947 the petitioner paid regular salaries to the following employees in the amounts indicated and in addition made payments designated as bonuses on the books and records of Juneau to such employees in the indicated amounts: Employee
Salaries
Bonuses
Total
Eugene Crans
$ 2,700
$ 2,000
$ 4,700
Roland Steiner
2,700
2,000
4,700
Margaret Steiner
1,800
2,000
3,800
W. Don Olson
2,475
2,000
4,475
Frank Moran
2,095
2,000
4,095
Total
$11,770
$10,000
$21,770 In their income tax return for 1947 the petitioners deducted as wages the amounts of salaries and bonuses shown above for the respective employees. Income tax and social security tax were withheld by petitioner from the bonuses. Schedules attached to the income tax returns of the petitioners for 1946 and 1947 show that during those years the petitioner paid wages to 37 and 72 different employees of Juneau, respectively. None of such employees, except Eugene *272 Crans, Roland Steiner, Margaret Steiner, W. Don Olson, Frank Moran and Louie Steiner, received a bonus. Of the bonuses paid by petitioner in 1946, $40,000 came back into the possession of the petitioner on February 26, 1947, from the following persons in the amounts indicated: Eugene Crans
$10,000
W. Don Olson
10,000
Boland and Margaret Steiner
20,000
Thereafter the petitioner executed instruments in the form of promissory notes dated March 15, 1947, due one year after date, and bearing interest at the rate of 4 percent per annum payable to the order of the following persons in the indicated amounts: Eugene Crans
$10,000
W. Don Olson
7,400
Roland or Margaret Steiner
19,100
The above-mentioned instrument reciting that the amount shown therein, $19,100, was payable to Roland Steiner or Margaret Steiner bears on the back thereof a computation indicating that the interest thereon for 9 months was $573 and that the total of the principal and interest was $19,673. Underneath the foregoing is the following notation: "Paid in full Dec. 2, 1947 Margaret Steiner." The foregoing recited payment was in the form of a check of the petitioner dated *273 December 2, 1947, which petitioner was unable to produce at the trial herein, for an undisclosed amount. Margaret Steiner continued to hold the check uncashed for an undisclosed period and upon cashing it on an undisclosed date turned over the proceeds thereof on undisclosed terms to Liqua-Dry Milk Company. The amount of the proceeds had not been returned to Roland Steiner or Margaret Steiner by Liqua-Dry at the end of 1952. The above-mentioned instrument reciting that the amount shown thereon, $7,400, was payable to W. Don Olson bears on the back thereof a computation indicating that the interest thereon for 8 1/2 months was $209.70 and that the total of the principal and interest was $7,609.70. The face of the instrument bears the notation: "Paid 11/26/47 W. Don Olson." The record is silent as to the amount and form or manner in which the foregoing recited payment was made. The above-mentioned instrument reciting that the amount shown therein, $10,000, was payable to Eugene Crans bears on the back thereof a notation showing principal as $10,000, interest thereon for 8 months as $266.64, and a total $10,266.64. The face of the instrument bears the notation: "Paid 12/7 Eugene Crans. *274 " The record is silent as to the amount and form or manner in which the recited payment was made. During the investigation of the income tax liability of petitioners and on July 18, 1947, at a meeting between petitioner and respondent's agents Haas and Kahler, the petitioner using the term "bonus" brought up the subject of the $80,000 of bonuses paid in 1946 and told the agents that if they touched that item, he would fight them to the highest court. Later during an examination in July 1948 by respondent's agents Koehn and Kahler of the books and records maintained by petitioner with respect to the operations of Juneau, Kahler asked petitioner to make further explanation of the $24,000 in currency which had been deposited in Juneau's bank account with the Bank of Mauston on February 11, 1947, and heretofore considered. The petitioner replied that if Kahler did not make any adjustments to the depreciation as claimed on petitioners' income tax returns for 1945, 1946, and 1947 and that if Kahler did not recommend any adjustments to the bonuses as claimed on the returns for 1946 and 1947, he (petitioner) would tell Kahler about more of his (petitioner's) cash transactions with customers *275 that would not be found on petitioner's books and records and that any accountant other than Kahler could audit his books and not find such transactions. The petitioner also stated that if Kahler did not make the foregoing adjustments, he would be glad to pay the additional taxes if they amounted to $30,000 or $40,000. At no time during the years 1945, 1946, and 1947 was there in existence any profit-sharing or bonus agreement or other arrangement between the petitioner and those of his employees to whom bonuses were paid in 1946 and 1947 whereby the petitioner was obligated to pay to such employees or such employees were entitled to receive any sums other than their regular salaries. The entire amounts of the bonuses paid by petitioner in 1946 and 1947 constituted nondeductible expenditures of the petitioners for such years. In 1946 and 1947 the petitioners took vacations in Florida. In 1947 the petitioner also acquired a boat. The living expenses of the petitioner and his family were $3,000 for 1945, $6,000 for 1946, and $6,000 for 1947 and constituted personal and nondeductible expenditures. On January 2, 1941, the petitioner acquired a 1941 Buick automobile at a cost of *276 $1,360, 50 percent of the use of which thereafter was for business purposes and the remainder of the use was for personal purposes. On June 12, 1946, the petitioner sold the automobile for $1,100. Of the difference between the cost and the sales price, or $260, 50 percent, or $130 constituted a nonallowable loss for 1946. During 1945 and 1946 the petitioner received nontaxable long-term capital gains in the amounts of $2,112.20 and $1,017.34, respectively. Opinion As part of the allegations of fact in support of their assignments of error the petitioners in their petitions state that the action of the respondent in computing net income by the use of increases in the net worth of petitioners as shown by the notices of deficiency is erroneous, arbitrary, excessive, and without foundation in fact or in law. In his answer the respondent denied the foregoing allegation. On brief the petitioners state that they rely on the reports of analysis made by McDonald Sprague for the years ended December 31, 1945, 1946, and 1947. In those reports deficiencies in tax and an overpayment of tax were shown in the following amounts for the indicated years: Year
Deficiency in tax
Overpayment
1945
$ 1,321.82
1946
$8,450.77
1947
30,748.08
*277 In our opinion the reports relied on by petitioners cannot be accepted as conclusive of the income tax liability of the petitioners for the years in question. The letter from McDonald Sprague addressed to petitioner and dated September 21, 1951, transmitting to petitioner the report for the year 1945 contains the following: In accordance with your instructions, we have made an analysis of the recorded cash receipts and disbursements and other supporting data of Juneau County Creamery, Mauston, Wisconsin for the year ended December 31, 1945. [Italics added.] The extent of this analysis is set forth in our report appended hereto. The transmittal letters accompanying the reports for 1946 and 1947 contain statements identical with the foregoing except as to the years covered by the reports. As indicated by the transmittal letters the petitioner did not instruct McDonald Sprague to make a complete audit either of Juneau or of his other affairs for the years in issue but limited the firm to an analysis only of "recorded" cash receipts and disbursements and other supporting data of Juneau. Further, the reports show that the computations of deficiencies in the income tax of petitioners *278 for 1945 and 1947 and an overpayment for 1946 made by McDonald Sprague were based on the income and deductions of Juneau arrived at by that firm in its analysis of the respective years and on all other income and deductions as shown on the returns filed by petitioners and as to which the firm made no analysis. As set out in our findings, McDonald Sprague observed in its report for 1947 that the amount of $24,000 in cash deposited February 11, 1947, in the account of Juneau with the Bank of Mauston was recorded on the books of Juneau as a loan. The firm then reduced that amount by $1,200 which it concluded represented proceeds from the sale of a truck and treated the remainder, $22,800, as "unidentified income" of Juneau for 1947. During the taxable years in issue Margaret Steiner was the bookkeeper for Juneau. Theretofore she had been bookkeeper for the same creamery since about January 1935 during which period it had been owned by others. The respondent placed in evidence a statement signed by Margaret Steiner which is in the form of an affidavit executed by her on January 12, 1952, and is sometimes hereinafter referred to as her statement of January 12, 1952. The statement contains *279 the following respecting the above-mentioned $22,800 computed by McDonald Sprague and treated by it as "unidentified income" of Juneau for 1947: Margaret Steiner, being first duly sworn on oath, deposes and says that she resides at the City of Mauston, Juneau County, Wisconsin; that during the years 1945 and 1946 in order to operate the Juneau County Creamery on a profitable basis and in view of the O.P.A. regulations it was necessary to pay over-ceiling prices for products and it was also necessary to charge over-ceiling prices; that at that time it was the policy of the Juneau County Creamery to maintain a revolving fund of cash with which to pay said overceiling prices and into which fund there was received over-ceiling prices for sales of the Creamery; that in the year 1947 it was determined by Mr. [Harold G.] Steiner that the net increment in this revolving fund should be deposited to the bank account of the Juneau County Creamery since at that time there was an announcement that the income tax authorities were not concerned with O.P.A. violations so long as the entire profit realized on over-ceiling transactions was reported, and further that at the time of said deposit there *280 was still some danger of O.P.A. prosecution and that therefore the deposit of Twenty-two Thousand Eight Hundred ($22,800.00) Dollars was shown on the books as an account payable rather than as income; that at the time I was fully aware of the purposes for which we were handling this account, namely to avoid O.P.A. prosecution, and I was further aware that it was the intent and purpose of Mr. Steiner to reflect this item in his income tax return for the year 1947; affiant further states that she with the aid of one Donald Olson prepared the figures for the income tax return of the year 1947 and unintentionally failed to reflect this item as Twenty-two Thousand Eight Hundred ($22,800.00) Dollars in sales for the year due to the fact that it had been labeled as a loan; that the time that the income was being computed for the Juneau County Creamery Harold G. Steiner was in the State of Florida on vacation; that Harold G. Steiner prepared his own income tax returns from the figures submitted to him by myself and said Donald Olson; that at the time of the deposit of said Twenty-two Thousand Eight Hundred ($22,800.00) Dollars I was not instructed to make any attempt to cover up this transaction *281 and that the full amount was deposited in the bank at Mauston; that this affidavit is made at the request of said Harold G. Steiner and with the full knowledge of the United States Statutes concerning perjury. [Italics added.) At the trial herein Margaret Steiner appeared as a witness for the petitioners. Although she there disclaimed having sworn to the statement of January 12, 1952, she did admit signing it. It is observed that the foregoing date, January 12, 1952, is the same as the date on which the petitioner signed and swore to statements purporting to show his net worth as of December 31, 1944, and December 31, 1947, and which statements were submitted by the attorney, then authorized to represent petitioners, to representatives of the Penal Division of the Internal Revenue Service during the time that division was considering the question of possible criminal violations by petitioner with respect to his Federal income tax returns for the years in issue. Although Margaret Steiner's statement of January 12, 1952, is to the effect that she had knowledge of the existence, purpose, and use of the revolving fund, that she had knowledge of the deposit of $22,800 thereof in the *282 bank account of Juneau and the recording of that amount on the books of Juneau as an account payable, and she made the statement of January 12, 1952, at the request of the petitioner, she, at the trial herein testified as follows on cross-examination: Q. Mrs. Steiner, it is my understanding that you testified that you were the bookkeeper at Juneau County Creamery for each of the years 1945, 1946, and 1947; is that correct? A. That is correct. Q. Were all the transactions engaged in by Juneau County Creamery entered on the books and records that you kept? A. Yes, they were. Q. Did that include transactions involving a revolving fund? A. I don't know anything about the revolving fund. In her testimony at the trial Margaret Steiner made no attempt to reconcile what she in effect stated in her statement of January 12, 1952, about the revolving fund with her testimony at the trial that she did not know anything about the revolving fund. Nor have petitioners otherwise attempted to make such a reconciliation. In her statement of January 12, 1952, which recites that it was made at the request of petitioner, Margaret Steiner attempted to assume responsibility for the false recording *283 on the books of Juneau of the deposit in question and for the failure of the petitioner to include the amount of the deposit in the income tax return of the petitioners for 1947 and thereby to exonerate the petitioner from all responsibility with respect to such matters. Her purpose in so doing obviously was to aid petitioner in preventing a claim of false and fraudulent conduct being made against him with respect to the matter. Since at the trial herein Margaret Steiner was called as a witness by the petitioners, we think it fair to conclude that her appearance in that capacity was at the request of petitioner. Considering her above-quoted testimony in the light of her statement of January 12, 1952, we also think it fair to conclude that such testimony was given for the purpose of discrediting her statement of January 12, 1952, and to aid petitioners in this proceeding where a claim of false and fraudulent conduct on the part of petitioner is involved. In view of what has been said above we are of the opinion that Margaret Steiner has shown a willingness on her part to make contradictory statements where to do so possibly would benefit petitioner in tax matters and that such willingness *284 seriously impairs the credibility of her testimony where favorable to him. As the record stands we are of the opinion that her testimony to the effect that all transactions engaged in by Juneau during the years 1945, 1946, and 1947 were entered on its books and records and that she did not know anything about the revolving fund was false and was known by her to be false. To the extent her statement of January 12, 1952, shows dealings during 1945 and 1946 by Juneau at prices in excess of O.P.A. ceiling prices, the existence, purpose, and use of the revolving fund, a deposit in the bank during 1947 of money taken from the revolving fund and which had not been reported as income, the false recording on the books of Juneau of the deposit in order "to avoid O.P.A. prosecution" and that the statement was made at the request of petitioner, we think it was true. Obviously the books and records of Juneau maintained in the manner, under the circumstances, and for the purposes set forth in Margaret Steiner's statement of January 12, 1952, were not intended by petitioner to reflect and did not reflect fairly or correctly the operations of Juneau and the income arising therefrom. Consequently *285 an analysis of such books and records restricted to "recorded cash" transactions could not be expected to reflect fairly or correctly the operations of Juneau and the income therefrom. Nor could such an analysis be expected to disclose either the existence of the cash revolving fund or the amounts therein from time to time maintained by petitioner with respect to Juneau's transactions involving sales at prices in excess of O.P.A. ceilings, particularly since the purpose for maintaining the fund was to avoid prosecution for such dealings. In this connection we think it significant that in none of the McDonald Sprague reports is any mention made of the cash revolving fund. The nearest approach is its mention in its report for 1947 of the $24,000 in cash deposited in Juneau's bank account on February 11, 1947, and entered on Juneau's books as a loan and which amount McDonald Sprague reduced to $22,800 and described the latter amount as "unidentified income" of Juneau for 1947. Aside from the foregoing inherent lack of integrity of the reports for the purpose urged by petitioners the reports for 1946 and 1947 are lacking in accuracy of analysis. Although the books and records of Juneau *286 disclosed that an amount of $2,000 paid to Juneau in 1946 by West Union Co-operative Creamery and an amount of $3,000 also paid to Juneau in the same year by Fayette Mutual Creamery Association represented the return to Juneau of sums deposited by Juneau with those organizations approximately 2 months earlier in 1946 as guarantees or bonds to insure the payment by Juneau of merchandise to be purchased by it on credit from those organizations, McDonald Sprague, for undisclosed reasons in its report for 1946 treated the total of the amounts, $5,000, as a liability of Juneau at December 31, 1946, described as "Advances on future sales," and in its report for 1947 treated the $5,000 as representing sales made by Juneau in 1947. The record discloses no basis to warrant such treatment. The petitioners, like every other taxpayer, were required by law to file an income tax return for each of the taxable years involved herein and to report thereon fully and honestly every item of gross income received by them. Inherent in that requirement was the further requirement that they maintain adequate records *287 of some kind to show to them and to the respondent the amount of income received by them in each year and the nature and basis for any deductions claimed. The respondent is not required to accept as accurate, complete, and correct, the returns filed or the sworn statement of the taxpayers that their returns completely and correctly disclose their tax liability. The respondent has authority to check the returns against the records of the taxpayers and if the records kept are incomplete, inaccurate, or otherwise unsatisfactory, he may seek information elsewhere to discover, assess, and collect the full tax liability imposed by law. Where the available records of a taxpayer do not fairly show the income of the taxpayer for the years in question, the respondent may use the increase in net worth method in determining taxable income. Holland v. United States, 348 U.S. 121 (1954), rehearing denied 348 U.S. 932 (1955); Morris Lipsitz, 21 T.C. 917 (1954), affd. 220 F. 2d 871 (C.A. 4, 1955), certiorari denied 350 U.S. 845 (1955). *288 In Morris Lipsitz, supra, it was said: The net worth method is not a system of accounting; it is not a substitute for either the cash or the accrual basis of accounting or any other recognized method of keeping books. When correctly applied to the facts of a particular situation it is merely evidence of income. And when the increase in net worth in greater than that reported on a taxpayer's returns or is inconsistent with such books or records as are maintained by him, the net worth method is cogent evidence that there is unreported income or that the books and records are inadequate, inaccurate, or false. It is not correct to say that the use of the net worth method is forbidden where the taxpayer presents books from which income can be computed for the net worth method itself may provide strong evidence that the books are unreliable. * * * Having heretofore found that the books and records maintained by petitioners for the years in issue were inadequate for fairly or correctly reflecting their income for those years, we hold that the respondent was justified in resorting *289 to the use of the net worth method in determining the taxable income of the petitioners for such years. The respondent has determined and we have found that on the indicated dates the petitioner had cash on hand in the following amounts: 12/31/44
12/31/45
12/31/46
12/31/47
$1,000
$1,000
$14,912.95
$10,900
At the trial herein petitioner testified that he not only did have cash on hand and in the foregoing amounts on the indicated dates but that his cash on hand on all those dates was considerably in excess of such amounts. The petitioner estimated his cash on hand on December 31, 1944, at between $60,000 and $70,000. He stated that the source of such cash was $5,000, $6,000, or $7,000 he received just prior to that date from the liquidation of the Steiner & Moran Partnership, $2,500 received in 1942 or 1943 from Chicago Transit Lines in settlement of an injury, a gift of $2,000 received from his grandmother when he became 21 years of age, and a gift of $50,000 received from Otto Blanke "right around Christmas time" of 1941, either at the close of 1941 or early in 1942. The petitioner also testified that the gift consisted of bills ranging in denominations *290 of from $20 to $100; that the gift was made to him in his (petitioner's) home in Mauston, Wisconsin, at a time when no one was present except him and Blanke; that immediately prior to the time Blanke handed him the $50,000 the money was in a fishing box located in Blanke's automobile and that Blanke carried the fishing box into the home of petitioner and placed it on the kitchen table; that after receiving the gift of $50,000 he (petitioner) kept it in his home for a short time and then placed it in a safety deposit box at the Bank of Mauston where it remained for quite a long time; and that Blanke died in July 1942. The petitioner further testified that practically the entire $50,000 was in the safety deposit box in 1944 and at the beginning of 1945 and that some of it was in the box on December 31, 1947; that he used about $20,000 of the gift to purchase an insurance policy in 1945 and possibly used some of the remainder of the gift for other purposes but did not recall doing so; and that except for his wife he disclosed the receipt of the gift of $50,000 from Blanke to no one including the Internal Revenue Service until approximately February 1958 when he informed his attorney who *291 is appearing herein for the petitioners. The petitioner testified that he had not disclosed receipt of the gift to respondent's agents for numerous reasons, which he stated as follows: (1) that since it was a gift, he did not consider it involved any tax liability, (2) that he did not tell anybody about it to avoid the creation of family friction, "and so on and so forth," and that he did not consider "it was anyone's business," (3) that Blanke gave the money to him and told him not to say anything about it and that if anything happened to him (Blanke), "it's yours" and that if he (Blanke) wanted it back, he would get it back from petitioner. At a meeting on July 18, 1947, of petitioner and respondent's agents Haas and Kahler the petitioner stated that he had never received any gifts or inheritances except a gift from his grandmother. More than 10 years later in an affidavit sworn to by him on February 17, 1958, the petitioner stated that he received a gift of $50,000 from Blanke "in late 1942" and that Blanke "passed away some time in 1944," the exact date not being available to petitioner at the time of making the affidavit. As set forth above the petitioner at the trial placed *292 the time of the gift as being at the close of 1941 or the early part of 1942 and the time of Blanke's death as being in July 1942. The evidence shows and we have found as a fact that Blanke died on July 22, 1942. Aside from the foregoing conflicts in the petitioner's sworn statements as to the time of the gift and the time of Blanke's death, the evidence shows and we have found that for several years prior to November 17, 1941, Blanke pursuant to the advice of a physician, had not driven an automobile, that from November 17, 1941, until December 27, 1941, Blanke was confined to a Milwaukee hospital, that on the latter date he was taken by automobile from the hospital directly to his house in West Allis to which he was confined under a physician's care until March 17, 1942, when, upon the advice of his physician that he was able to make the trip, he and his wife went by automobile directly to Florida with his wife doing the driving throughout the trip, and that he remained in Florida until his death. Respecting the testimony of petitioner to the effect that on December 31, 1944, he had cash on hand of between $60,000 and $70,000 consisting principally of a gift of $50,000 cash from *293 Blanke, it is observed that in his statement sworn to on January 12, 1952, he showed his cash on hand on December 31, 1944, as $15,500. With respect to petitioner's testimony that practically all of the $50,000 given him by Blanke was in the safety deposit box in 1944 and at the beginning of 1945 and that some of it was in the box on December 31, 1947, and that, except for using about $20,000 of the gift to purchase a life insurance policy in 1945, he possibly used some of the remainder but did not recall doing so, petitioner, as we understand his affidavit sworn to on February 17, 1958, used in 1945 $22,569.49 of the gift for the payment of life insurance premiums and $6,000 to purchase United States Treasury bonds or a total of $28,569.49. If the latter amount is subtracted from $50,000, the remainder is $21,430.51. Since the petitioner does not recall using any of the remainder of the $50,000 and as he testified that some of the $50,000 was on hand on December 31, 1947, it would appear that the portion on hand on December 31, 1945, December 31, 1946, and and December 31, 1947, was in excess of $21,000. However, in the statement sworn to by him on July 6, 1948, his cash on hand on *294 December 31, 1947, was shown as $10,900, an amount which he stated to respondent's agents on July 6, 1948, represented his (petitioner's) best estimate of the cash he had on hand on December 31, 1947, and that he had no records as to his cash on hand on such date. In the statement sworn to by petitioner on January 12, 1952, his cash on hand on December 31, 1947, was shown as $11,773. In a net worth statement prepared for petitioner for 1945, 1946, and 1947 by McDonald Sprague and submitted by petitioner to the Department of Taxation of the State of Wisconsin in connection with an investigation by that department of the petitioner's Wisconsin state income tax liability for 1945, 1946, and 1947, the petitioner's cash on hand on the following dates was shown in the indicated amounts: 12/31/44
12/31/45
12/31/46
12/31/47
$15,500
$1,000
$1,000
$10,900
Although by his testimony the petitioner has indicated that he disclosed to his wife Ollie Mae Steiner the receipt of the gift to him of $50,000 by Blanke, prior to disclosing it on or about February 17, 1958 to his attorney, she did not appear as a witness at the trial herein nor was any explanation offered as *295 to her failure to do so. In our opinion her failure to appear as a witness is significant and gives rise to the presumption that her testimony, if it had been produced, would have been unfavorable. Wichita Terminal Elevator Co., 6 T.C. 1158, 1165 (1946), affd. 162 F. 2d 513 (C.A. 10, 1947); W. A. Shaw, 27 T.C. 561, 573 (1956), affd. 252 F. 2d 681 (C.A. 6, 1958). In our opinion a consideration of the record relating to the gift of $50,000 by Blanke to petitioner and the amount of petitioner's cash on hand on December 31 of the years 1944 through 1947, in the light of the existing conflicts between the testimony herein of petitioner and sworn statements made by him at various times, discloses that the petitioner has exhibited a willingness to contradict his sworn statements by the other sworn statements if thereby he might escape payment of income taxes. Such a willingness shows a disregard for the importance of an oath and a lack of credibility in his testimony where favorable to himself. Since we have found that from November 17, 1941, until *296 December 27, 1941, Blanke was confined to a hospital in Milwaukee and then to his house in West Allis until about March 17, 1942, when he went directly to Florida, we are unable to find that at any time during that period he was in the home of petitioner in Mauston, as petitioner's testimony as to the time and place of the gift would require, in order to conclude that Blanke made such gift. Certainly the statement contained in the affidavit sworn to by petitioner on February 17, 1958, that the time of the gift was "in late 1942" is of no assistance to the petitioner in view of Blanke's death on July 22, 1942. In our opinion a fair consideration of the record relating to the gift and the petitioner's cash on hand on the critical dates here involved fails to establish that in 1941 or 1942 or any other year Blanke made a gift to petitioner of $50,000 or any other amount. Being of that opinion we are unable to find from the record that his cash on hand on December 31, 1945, 1946, and 1947 was in amounts other than the amounts set out in our findings of fact. The respondent has determined that on December 31, 1947, the petitioner had an investment in Town Hall Tavern of $37,000. With *297 respect to the transaction involving the sale of the Town Hall Tavern properties by Elizabeth Thoma, the petitioners on brief take the position that on the record presented we should conclude that petitioner "had only a $10,500 loan to Elmer Warnecke in January 1948." Warnecke, a brother-in-law of the petitioners and a witness for them, testified that in 1947 he lived in Beloit, Wisconsin, where he was employed as assistant manager of a J. C. Penney Company store, that he then had been in the employment of that company for 22 years, that he desired to go into business for himself and that at that time he had no experience in the tavern business. He stated that in 1947 he had $26,500, which consisted of cash in the amount of $23,000 which had been given to him early in 1943 by his father who died in September 1943 and $3,500 which represented money he (Warnecke) had accumulated between 1943 and 1947, an undisclosed part of which was on deposit in a bank and the remainder was in a safety deposit box. Warnecke also stated that after the gift to him of the $23,000 cash he, for some reason he was unable to recall, kept it in hiding in various places that he "had at various times and that *298 I still use as hiding places." He further testified that petitioner told him the price of the Town Hall Tavern was $37,000, that although he had never seen the tavern, the price "seemed agreeable" to him on the basis of petitioner's "say-so"; that he decided to purchase the tavern and arranged with petitioner to provide $10,500 of the purchase price for which he executed to petitioner a note dated January 4, 1948, on which he had paid $6,000 by 1958 and during the latter part of that year paid $4,500; that about August 1947 he removed the above-mentioned cash of $23,000 from some place or places he was unable to recall and using the $3,500 he had accumulated between 1943 and 1947 he delivered $26,500 in cash to petitioner or to John J. Steiner, just which he was unable to recall, as a payment on the purchase price of the tavern. Subsequent to the trial herein the parties placed in the record a deposition of John J. Steiner. The deposition does not show nor is there any suggestion therein that Warnecke at any time delivered $26,500 in cash, or any other sum of money to John J. Steiner. The deposition shows that petitioner delivered $21,000 in cash to John J. Steiner in the latter's *299 home with instructions to deliver it to Elizabeth Thoma to enable her to pay creditors and that on the following day John J. Steiner made delivery of the money to Elizabeth Thoma as he had been instructed. The deposition also shows that at the time he delivered the $21,000 in cash to John J. Steiner the petitioner, although stating that Warnecke was interested in buying the Town Hall Tavern, said nothing as to whether the $21,000 was money of petitioner or that of Warnecke. The deposition further shows that John J. Steiner does not know whose money the $21,000 was. Nor does the deposition show that petitioner ever delivered to John J. Steiner any amount other than the abovementioned $21,000. At the trial the respondent called the petitioner as an adverse witness. During the questioning of petitioner by counsel for the respondent the following occurred: Q. Isn't it a fact, Mr. Steiner, that on or about October 31, 1947 you gave $21,000.00 to John J. Steiner at Mauston to deliver to Milwaukee as part payment on the sales price of the Town Hall Tavern? A. No, it is not a fact. Q. Did you at any time in 1947 give any money to John J. Steiner to deliver to Milwaukee in connection *300 with the sale of the Town Hall Tavern? A. Well, I don't remember whether I gave it to him or Mr. Warnecke gave it to him. Q. The question was, did you? A. I don't know, I don't know. * * *
Q. Did you have any interest at any time in the Town Hall Tavern? A. No, not in the Town Hall Tavern, I had no interest. Under questioning by counsel for the petitioners the petitioner stated that he advised Warnecke to buy the Town Hall Tavern and told him he (petitioner) would assist him with the "financing and everything"; that eventually Warnecke bought the tavern, and that in connection with the purchase, he (petitioner) within "a very few days" prior to January 4, 1948, loaned Warnecke a sum of money which he thought was in the amount of $10,500. The petitioner further testified as follows: Q. And do you recall how much money was handed to you by Mr. Warnecke to pay to - A. I don't remember whether the money was handed to me or whether it was given to John J. Steiner or just how the transaction; but anyway, between Mr. Warnecke and I, we gave John J. Steiner enough money to go down there and have Elizabeth Tomah pay up these bills. Now, she had a certain amount she needed *301 and from memory, I just don't recall what that was, but that was to pay the immediate bills to keep these creditors off their back. What this amount exactly was, I think the record someplace shows it; but I just don't recall; but it was a considerable sum of money, and it included this $10,500.00 that I gave Mr. Warnecke. Q. And whatever the sum of money was, this money came from Mr. Warnecke; is that correct, sir? A. Yes, sir, whatever there was over and above the $10,500. I want to clarify that. The reason advanced by petitioner as to why John Milton Steiner, instead of Elmer Warnecke, executed the instruments to purchase the Town Hall Tavern properties, which pursuant thereto later were conveyed to him, was that John Milton Steiner had resided in Milwaukee for the length of time required for the issuance to him by that city of a license to operate the tavern whereas Warnecke, because of his lack of such residence, was unable to obtain a license. From a consideration as a whole of the portion of the record relating to the sale of the Town Hall Tavern properties in 1947 and the payments in cash of the $37,000 purchase price thereof, we are not impressed by Warnecke's testimony *302 with respect to his relationship to the transaction and to his furnishing in cash $26,500 of the purchase price. The record is clear that the petitioner, without stating that all or any portion thereof represented cash received from Warnecke, delivered $21,000 in cash to John J. Steiner who in turn delivered it to Elizabeth Thoma as part of the purchase price of the properties and the first partpayment, which occurred on October 31, 1947. By his own testimony the petitioner shows that of the second and last payment on the purchase price made in cash on December 29, 1947, he, not many days before January 4, 1948, furnished $10,500 in cash for making such payment. In our opinion the petitioner not only furnished all of the cash with which the first payment was made but also furnished all of the cash with which the second and last payment was made. To accept Warnecke's testimony would require us to ignore not only the various improbabilities inherent in it but its infirmity in other respects. This we are unable to do. From the record presented we have concluded and found as a fact that on December 31, 1947, the petitioner had either an investment in the Town Hall Tavern of $37,000, *303 or an indebtedness owing to him of $37,000 on account of the sums of money he had furnished in payment therefor. In determining the deficiencies herein, the respondent, for the purpose of the computation of the reserves for depreciation for the various depreciable properties, determined that the useful lives of the properties were as follows at the time of acquisition or the date of disbursement thereof: No. of
years
S & M building
33 1/3
Tessmer Tavern building
33 1/3
Improvements to Tessmer Tavern build-
ing
32 1/3
Union Center Plant building
33 1/3
Garage building
33 1/3
Juneau County Creamery building
33 1/3
Improvements to Juneau County Cream-
ery building
31
Juneau County Creamery equipment
20
Additional equipment Juneau County
Creamery
20
Trucks and automobiles
4
Truck bodies
4
The respondent's determinations in the foregoing respects are presumed to be correct and, in the absence of evidence showing that they are erroneous, we have made findings that the useful lives of the respective properties were as set out above. On brief the petitioners suggest that the useful life of the Juneau County Creamery equipment and additional *304 equipment was only 4 or 5 years instead of 20 years as determined by respondent. In support of the suggestion the petitioners rely on the reports of analysis made by McDonald Sprague for 1945, 1946, and 1947 with respect to Juneau wherein the depreciation reserve shown for equipment is based on a useful life of 4 years for the portion of the equipment comprising the "original purchase" in 1945 and 5 years for the additional equipment purchased thereafter in 1945 and during 1946 and 1947. The evidence shows that early in 1948 the properties used by petitioner in the operation of Juneau were transferred by him to Liqua-Dry Milk Company, a corporation in which he owned 92 percent of the stock and of which he was president. Thereafter the properties were employed by the corporation in the same kind of business previously conducted by Juneau. The McDonald Sprague reports were made in September 1951. The accounting employee of McDonald Sprague who prepared the reports including the computation of the depreciation reserve for equipment shown therein, Ivan Cullen, testified that he employed useful lives of 4 years and 5 years in computing the reserve because of information he had received *305 from employees at the creamery to the effect that during 1945, 1946, and 1947 the plant was operated on an around-the-clock basis and in his opinion the use of useful lives of 4 years and 5 years, respectively, would provide an equitable rate of depreciation. There is no showing that Cullen at any time made an examination of any of the equipment or, if he had made an examination of it, he was qualified to give competent testimony respecting its useful life or the extent of the depreciation thereof during any year or years. At this point we observe that the petitioner testified that continuously during 1945 through 1947 Juneau operated at full capacity on a 24-hour a day schedule and that such slow-downs as occurred were the result of mechanical failures in the equipment or similar contingencies. Although the owner of the equipment during the taxable years in issue and shown to have been familiar with it and its operation, the petitioner has not favored us with any testimony of his respecting the normal useful life of such equipment, or the extent, if any, to which its operation during the years in issue affected its useful life. Since the operating history of the equipment subsequent *306 to 1947, although apparently available to petitioners, has not been furnished us, we can only conclude that if it had been furnished, it would not be favorable to the position of the petitioners here. Wichita Terminal Elevator Co., supra. In determining the taxable income of the petitioners for 1946 and 1947 the respondent has determined that $15,000 of the $80,000 of bonuses paid by petitioner in 1946 and the entire amount, $10,000, of the bonuses paid in 1947 constituted nondeductible expenditures of the petitioners for those years. By his amended answer he asks that we find that the entire amount of the bonuses for each of the years constituted nondeductible expenditures of the petitioners for such years. The position of the petitioners is that the payments totaling $80,000 made by petitioner in 1946 and those totaling $10,000 made in 1947 to the employees of the petitioner as set out in our findings were made pursuant to a profit-sharing agreement between the petitioner and such employees and constituted reasonable compensation made by petitioner to such employees for services theretofore rendered by them. In support of their position that the payments were *307 made pursuant to a profit-sharing agreement, the petitioners rely on certain testimony of petitioner and Margaret Steiner to show the creation of such an agreement in 1945 and its continued existence thereafter through 1947. Under questioning by counsel for the petitioners the petitioner testified as follows: Q. Now, you have been asked some questions concerning the profit-sharing, as you call it, with the employees whose names you have previously identified. Will you explain to the Court the basis under which this arrangement took place and actually what took place and when as best you can recall? A. Well, when I took over this plant from Mr. Burton after I had made the audited survey with Mr. Surolski and we were of the assumption or I was of the assumption that I was going ahead with the deal and take it over, I realized that due to the fact that it was at that time when you couldn't hire people and there was terrific shortage of labor and so on and so forth, that I could never make a success of the operation of this plant by myself. Some of these people knowing that the plant would possibly lock up had already started looking for other jobs and I went to him, Margaret Steiner, *308 Roland Steiner, Gene Kranz, different ones, explained to them what the situation was. I said I think we can put this plant back on its feet if we all go to work. Will you stay with me; what's your idea? And we were all of an opinion that we could do that, and I told them that if we could put it on its feet that they would share in the profits. Q. And that was the basis under which the payments were made as in the amounts which you have previously identified? A. I think I indicated to them that if we could make money, I would split the profits with them, divided equally amongst them. * * *
THE COURT: Just a minute. I am a little confused with your last answer. Here's $80,000.00 which has been distributed to six employees. Now, you said you think you indicated to them that the profits would be split with them. Are you serious about this; that you don't know a thing that important? THE WITNESS: Well, I - this was thoroughly understood that I was to be the one that handled it; in other words, I was to determine how much they were to get and so on, and how it was to be divided. There was never any general you get so much or you get so much, because we didn't know if we were *309 ever going to put the thing on its feet or not. It was just a general discussion, and I told these people, if you will stay with me, I says, sometimes we'll have to work twenty-four hours a day in the plant to get it back on its feet, and if you will stay with me, I'll share the profits with you; that it was always to be my determination and legally I had no obligation to these people. On direct examination Margaret Steiner testified as follows: Q. And did you ever have any conversation with Mr. Steiner about a share in the profits as you have described it? A. Yes, we did. Q. Approximately when did you first talk to him about it? A. When he first took over the plant. Q. What did he say to you and what did you say to him if anything and who was present? A. He wanted us to stay with him because he felt that he needed us, and promised us a share in the profits if we would stay. Q. And by we, who do you mean? A. Gene Kranz, Roland Steiner, Don Olson, myself, and I believe Frank Moran and Louie Steiner. Q. Now, how many of those people had worked previously with the other company that you referred to, if any? A. My husband Roland Steiner, myself, Gene Kranz, and I *310 believe that is all. * * *
Q. Based upon your education and experience at that time, what if any distinction did you make from a bookkeeping point of view between wages, bonuses, and profit sharing? A. None; no distinction. On cross-examination she testified as follows: Q. Mrs. Steiner, I believe during Direct Examination, you testified as to a conference, I believe you said Mr. Steiner was present, where the word profit sharing was discussed; is that correct? A. Yes. Q. When was this conference held? A. When Mr. Steiner was considering taking over - Q. Excuse me. At what time? A. Well, I cant' remember the exact date. It was just before he took over the plant. Q. And who was present at that time? A. Some of the employees who were to share in the profits. Q. Well, who were the employees? A. Key employees. Gene Cranz crane, Roland Steiner, myself, and Mr. Steiner, of course, and I can't be sure about some of the rest, whether they were there or not. Q. Well, what did Mr. Steiner say? A. He said that if we would stay with him and made a profit, we would share in the profits. The amounts in issue were shown on the books of Juneau as bonuses. The income *311 tax returns of the petitioners for 1946 and 1947 were prepared by petitioner. In a schedule attached to the 1946 return the items comprising the $80,000 are included as part of the total shown as "wages" paid by Juneau in that year while in a schedule attached to the 1947 return the items comprising the $10,000 are included as part of the total shown as Juneau's "payroll" for the year. In meetings with the respondent's agents in July 1947 and July 1948 during their investigation of the income tax liability of the petitioners for 1946 and 1947, the petitioner referred to the amounts as bonuses. On brief the petitioners have directed our attention to the report of McDonald Sprague of its analysis with respect to Juneau for 1946 as having referred to the $80,000 in issue as profit sharing bonuses. It is true that in that report the $80,000 is described as: profit sharing bonuses in the sum of $80,000.00 paid to a group of employees who had been hired with a verbal understanding that if the company [Juneau was a sole proprietorship and was so operated by petitioner] made profits that they were to participate to same extent in those profits. As nearly as we were able to ascertain, no *312 definite provision as to amounts of boruses had been agreed upon. * * * [Italics added.] In this connection it is observed that nowhere in the report or elsewhere in the record is there shown the basis or source upon which McDonald Sprague relied in making the foregoing description of the $80,000. In the absence of such a showing and in view of the fact that petitioner had employed McDonald Sprague to make the analysis and report, we think it fair and reasonable to conclude that the matters contained in the statement emanated from the petitioner. In its reports for 1946 and 1947 McDonald Sprague treated the respective amounts in issue as "profit sharing bonuses" and, as such, shares of the profits of Juneau to which the recipients were entitled under the "verbal understanding" mentioned in the 1946 report. This was done despite, as recited in the report for 1946, the recipients "were to participate to same extent" in the profits and in that year four of the six employees were paid $15,000 and the other two were paid only $10,000 each. Heretofore we have observed the willingness of petitioner and Margaret Steiner to make contradictory statements where to do so possibly could be *313 of benefit to petitioner taxwise with respect to the years in issue and that such willingness demonstrates a lack of credibility in their testimony where favorable to petitioner. A conclusion here that the amounts of $80,000 and $10,000 in issue were in reality shares of the profits of Juneau to which the recipients were entitled by reason of the terms of their employment by and service to petitioner would require acceptance as credible of the testimony of petitioner and Margaret Steiner respecting their employment and service. In the circumstances present we do not so accept it. In this connection we think it significant that although Olson and Louie Steiner were dead at the time of the trial, neither Crans, Moran, nor Roland Steiner were called by petitioners as witnesses. Respecting the reasonableness of the compensation of the recipients of bonuses when the bonuses are added to their regular salaries, the testimony of the petitioner indicates that the reason the previous owner of the business and properties of Juneau, who also had acquired other properties in Wisconsin and elsewhere, disposed of the business and properties of Juneau to petitioner was that the previous owner had *314 become so financially involved that there was a serious question as to his solvency and therefore of his ability to obtain a renewal of his license to operate Juneau. In acquiring Juneau the petitioner acquired an established business which had been in operation for 10 years or longer. In addition, there was a strong demand, at least in 1945 and 1946, for the products of Juneau and for a portion of which at prices in excess of O.P.A. ceiling prices. Exhibit No. 38 placed in evidence by petitioners shows salaries, apparently after withholding for Federal income tax and social security tax, or take home pay, for December 1944 for the indicated persons as follows: Eugene Crans
$123.50
Roland Steiner
105.20
Margaret Steiner
73.60 The exhibit also shows such monthly salaries as follows for February and the remaining months of 1945: Eugene Crans
$155.15
Roland Steiner
127.00
Margaret Steiner
87.50 The exhibit further shows the following with respect to such monthly salaries during 1946: During the period January to September, Crans' salary was increased by increases during the period from $160.65 in January to $193.45 for September and the remaining *315 months of the year. Roland Steiner's salary was increased by increases during the period from $150.25 in January to $183.05 for September and the remaining months of the year. Margaret Steiner's salary was increased by increases during the period from $89.50 in January to $130.80 in October and the remaining months of the year. Frank Moran's salary was increased from $138.70 in June to $155.10 in November and December. Olson's salary was increased by increases during the period from $138.60 in June to $178.20 in October and for the remaining months of the year. Exhibit No. 37 placed in evidence by petitioners shows the following with respect to such monthly salaries during 1947: In January the salaries of Crans, Roland Steiner, and Margaret Steiner were $193.45, $183.05, and $130.30, respectively, and remained at those amounts during the remainder of the year. Moran's salary of $155.10 in January was increased to $159.35 in February and remained at that amount during the remainder of the year. Olson's salary of $195.10 in January and subsequent months was increased to $215.75 in October and remained at that amount throughout the remainder of the year. From the foregoing it is apparent *316 that the salaries of Crans, Roland Steiner, and Margaret Steiner for 1945 were substantially in excess of those at the end of 1944 and for 1946 were substantially in excess of 1945. The salaries of the three throughout 1947 were the same as at the end of 1946 while during 1947 the salaries of Moran and Olson were increased. The evidence shows Margaret Steiner was furnished an assistant in her work, at least during 1947 if not earlier. There is nothing in the record to indicate that at any time during 1945, 1946, or 1947 any of the recipients of the bonuses in issue worked 24 hours a day or even time in excess of their normal hours of employment. The bonuses of $15,000 paid to each Crans, Roland Steiner, Margaret Steiner, and Olson in 1946 were paid in two installments, one on November 6 and the other on December 23. The bonuses of $10,000 paid to each Moran and Louie Steiner were paid on December 23, 1946. At the time of the payment of the bonuses Crans, Roland Steiner, and Margaret Steiner had been employed at Juneau since the petitioner acquired it on February 16, 1945, or a period of approximately 21 or 22 months. Olson had been employed there for only about 6 months, Moran for *317 6 or 7 months, and Louie Steiner for only 3 or 4 months. The record does not disclose the basis used by the petitioner in determining the amounts paid the foregoing employees. If the length of service, their present and prior compensation, and character of service rendered be regarded as the measure, it appears that the three employees with longest service were rankly discriminated against in favor of the three with the shortest service. We are of the opinion that no part of the bonuses paid in 1946 and 1947 constituted reasonable compensation for services of the recipients thereof and further are of the opinion that there was no business basis or reason to support the payment of the bonuses in either 1946 or 1947. Accordingly we have found as a fact that the entire amounts of the bonuses were nondeductible expenditures of the petitioners for such years. Issue 3. Additions to Tax for Fraud With Intent to Evade Tax. Findings of Fact The income tax return of the petitioner for 1945 and the income tax returns of the petitioners for 1946 and 1947 were false and fraudulent and were made with intent to evade tax. Part of the deficiency for each of the foregoing years is due to fraud *318 with intent to evade tax. Opinion The respondent has determined against the petitioner for 1945 and the petitioners for 1946 and 1947 the addition to tax provided in section 293(b) of the Code of 1939 for fraud. The respondent has the burden of proof as to this issue and contends that the record establishes the correctness of his action. The petitioners contend that the respondent has failed to discharge his burden. An affirmative willful attempt to defeat and evade income tax may be inferred from conduct such as making false entries or alterations, or false invoices or documents, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind of such affairs, and any conduct the likely effect of which would be to mislead or to conceal. Spies v. United States, 317 U.S. 492 (1943). Through the use of his "revolving fund" of cash during 1945, 1946, and 1947 the petitioner handled a portion of the business of Juneau in such a manner as to avoid making the records usual in the purchase and sale of merchandise by Juneau, in that cash was paid for purchases and cash was received from the *319 sales of the products produced by Juneau. Since no record was maintained as to such purchases and sales or to show the amount of cash in such fund at any given time or times, the effect of such conduct was both to mislead and to conceal. The petitioner's handling through Sam Green of orders obtained by Fred Boyd in 1946 from Ideal Baking Company of Tyler, Texas, W. D. Wright Produce Company, Hobart, Oklahoma, and others for sweetened condensed milk, which was then in scarce supply, was done in such a manner as to avoid showing on Juneau's books and to conceal the disposition of and the recipients of the excess of the total amounts actually paid by the purchasers for such milk over the amounts shown on Juneau's books as having been received by it from the sale of the milk. Respecting the deposit on February 11, 1947, in Juneau's account with the Bank of Mauston of $24,000 in cash taken from the revolving fund and representing proceeds of unrecorded sales of products produced by Juneau, the petitioner testified that while in Miami, Florida, and during a telephone conversation, he instructed Olson "to deposit all the cash that was available in the safe in the bank and to show it on *320 our records so that there would be no question as to tax liabilities and so on and so forth, because I wanted no trouble." The petitioner also stated that the handwriting on the deposit slip used in making the deposit, a duplicate of which was placed in evidence, looked like Olson's handwriting. For deceptive purposes the $24,000 was knowingly and falsely shown on the books and records of Juneau as a loan from the bank on the date of the deposit despite the fact that it constituted proceeds from sales of products produced by Juneau. From the record before us we are satisfied that the treatment of the $24,000 on the books and records of Juneau was made pursuant to instructions of the petitioner and that petitioner knowingly and willfully omitted the enire amount thereof from income in his preparation of the petitioners' income tax return for 1947. Being aware of the inadequacy of his books and records for fairly or correctly reflecting his income and knowing that the amounts of income reported in his returns for the years in question were not correct, the petitioner, through his attorney herein, submitted to the Internal Revenue Service his affidavit of February 17, 1958. In the affidavit *321 petitioner recited the discredited story of a gift of $50,000 to him by Otto Blanke "in late 1942" despite the fact that Blanke had died on July 22, 1942, that petitioner during the period from 1922 to July 18, 1947, had received no gift or inheritances, and that petitioner had so informed the respondent's agents Haas and Kahler on July 18, 1947. The obvious purpose of the recitals in the affidavit as to a gift of $50,000 by Blanke was to mislead the respondent and conceal from him the true income of the petitioners. The respondent's determinations of the additions to tax for fraud are sustained. Issue 4. Failure of Respondent to Determine That Assessment and Collection of the Deficiencies in Tax and Additions to Tax Are Barred by the Expiration of the Period of Limitations. Opinion Since section 276(a) of the Code of 1939 provides that in the case of a false or fraudulent return with intent to evade tax, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time, and since, as set out in our findings, the returns of *322 the petitioners for the years in issue were false and fraudulent and were made with intent to evade tax, we hold that the assessment and collection of the deficiencies in the tax of the petitioners and additions to tax for the years in issue are not barred. The respondent is sustained as to this issue. Issue 5. Addition to Tax Under Section 294(d)(1)(A) for Failure to File Declaration of Estimated Tax. Opinion For 1947 the respondent determined an addition to tax under section 294(d)(1)(A). Section 294(d)(1)(A) imposes an addition to tax in case of failure to make and file a declaration of estimated tax within the time prescribed, unless such failure is shown to be due to reasonable cause and not to willful neglect. The petitioners have the burden as to this issue. The petitioners point us to nothing in the record and we find nothing to indicate that they filed a declaration of estimated tax for the year 1947 or that their failure to file the required declaration was due to reasonable cause and not to willful neglect. Accordingly the respondent's action in determining that petitioners *323 were liable for an addition to tax under section 294(d)(1)(A) for 1947 is sustained. Issue 6. Additions to Tax Under Section 294(d)(2) for Substantial Underestimate of Estimated Tax. Opinion The deficiency notice for 1945 sent to the petitioner contains a statement to the effect that an addition to tax under section 294(d)(1)(A) had been determined against him for "substantial underestimation of declaration of estimated tax." A computation forming part of the notice of deficiency shows a "Computation of Addition to Tax for Substantial Underestimation of Estimated Tax under Section 294(d)(2)" in the amount of $2,004.88. The foregoing amount is the only amount shown in the notice of deficiency determined under section 294(d). As shown in the previous issue, the addition to tax imposed by section 294(d)(1)(A) is for failure to make and timely file a declaration of estimated tax. The addition to tax imposed by section 294(d)(2) is for a substantial understimate of estimated tax. In the situation presented and in the absence of any contention to the contrary by the parties we have concluded *324 that the addition to tax of $2,004.88 computed and determined by respondent was for the petitioner's substantial underestimate of estimated tax and is to be regarded as having been determined under section 294(d)(2). We so treat it herein. The respondent also has determined additions to tax under section 294(d)(2) for 1946 and 1947. In his amended answer in Docket No. 79469, covering the years 1946 and 1947, the respondent has made no claim for the addition to tax determined under section 294(d)(2) for 1947 and states on brief that the issue raised by his determination with respect thereto has been eliminated. In view of the foregoing we conclude the respondent has conceded the issue relating to the addition to tax under section 294(d)(2) for 1947 and accordingly holds for the petitioners on that issue. In view of the foregoing there remains for decision under this issue only the correctness of the respondent's action in determining additions to tax under section 294(d)(2) for 1945 and 1946. For lack of evidence to show error, the respondent's action must be sustained. The petitioner was charged with income tax evasion for 1946 and 1947 in a criminal indictment returned in the *325 United States District Court for the Eastern District of Wisconsin. Upon the recommendation of his then attorneys, Theodore W. Brazeau and Ray T. McCann, the petitioner in 1953 entered a plea of nolo contendere to the count of the indictment relating to 1946 and the indictment, insofar as it involved a count relating to 1947, was dismissed. The findings and holdings heretofore set forth herein have been made independently of and without consideration of the foregoing plea of the petitioner relating to 1946. The petitioners on brief filed after the trial herein have moved that all the documentary evidence and all of the testimony of respondent's agents Haas, Koehn, and Kahler presented herein by respondent be suppressed on constitutional grounds. This action of the petitioners is an attempt to raise on brief an issue not raised in the petitions, nor for the raising of which was any motion ever made to amend the petitions. We have consistently held that since the primary purpose of pleadings is the joinder of issue between the parties, issues attempted to be raised by brief will be disregarded. Eleanor C. Shomaker, 38 T.C. 192 (1962); Merle P. Brooks, 36 T.C. 1128 (1961). *326 Accordingly we must decline to consider the foregoing question proposed by petitioners. Decisions will be entered under Rule 50. Footnotes
1. These checks cleared through the Bank of Mauston, Mauston, Wisconsin.↩
1. Although stated as $3,000 on that date, petitioner on further investigation ascertained that the amount of the gift was only $2,000.↩